**CITIZENS FOR CHOICE et al., Appellees,**

v.

**SUMMIT COUNTY COUNCIL et al., Appellants.**

[Cite as *Citizens for Choice v. Summit Cty. Council* (2001), 143 Ohio App.3d 823.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 20117.

Decided May 9, 2001.

824

Alfred E. Schrader, for Citizens for Choice and Thomas W. Wehner, appellees.

Sherri Bevan Walsh, Summit County Prosecuting Attorney, James D. Casey, Allyson Miller Leonard, Sandy J. Rubino and William J. Price, Assistant Prosecuting Attorneys, for Summit County Council, appellant.

Charles T. Riehl and Frederick W. Whatley, for village of Richfield, appellant.

John P. Slagter, David L. Drechsler and Peter W. Hahn, for amicus curiae Richfield Township, appellant.

*Per Curiam.*

Summit County Council and the village of Richfield filed appeals from the decision of the Summit County Court of Common Pleas issuing a declaratory judgment ordering the council to enter an order erecting a new township pursuant to R.C. 503.09.

I

In April 1998, a group of residents of Richfield Township, organized as "Citizens for Choice" ("CFC"), desired to secede from Richfield Township because the citizens of Richfield Village comprised approximately two-thirds of the population of the township. Allegedly, this imbalance of population resulted in governance of the entire township in a manner that benefited the village to the detriment of the balance of the township. CFC circulated a petition pursuant to R.C. 503.09 requesting Summit County Council to erect a new township from the area not included in the village. R.C. 503.09 permits the erection of a new township, excluding the area of the municipal corporation, when a petition for this purpose is signed by a majority of the freehold voters in the portion of the township outside the municipal corporation. A freeholder is an owner of "an interest in land, the duration of which is not fixed by a specified or certain period of time." *Cunningham v. Crabbe* (1992), 73 Ohio App.3d 596, 598, 597 N.E.2d 1210, 1211, citing 41 Ohio Jurisprudence 3d (1983) 434, Estates, Section 4.

On April 21, 1998, CFC submitted to council forty-eight petition sheets, with a total of 708 original signatures. At approximately the same time, 100 signed withdrawals of signatures were submitted to council. On April 22, 1998, the clerk of council advised the county auditor [1] about the petitions and asked the auditor to determine the number of freeholders in the portion of the township seeking to secede, to establish the needed majority for the petition to succeed. On April 28, 1998, the clerk sent the petitions and withdrawals to the board of elections to determine how many signatories were registered freehold voters.

---

1. The clerk attached to his letter a copy of an opinion letter from the county's prosecuting attorney, advising council of the procedure to be followed in response to the filing of the petition. The letter was actually authored prior to the filing of the petitions. In the letter, the prosecuting attorney advised the clerk to seek a determination of the total number of freeholders, to delete any withdrawals already submitted, and to submit the petitions, minus withdrawals, to the board of elections for a count of the valid freehold voters on the petitions. It appears that the clerk followed this procedure. The prosecutor's opinion letter stated that when determining whether the signatures were valid, "the determination would be the date of the filing of the petition[,]" in this case, April 21, 1998. This indicates a firm cutoff date for the petition count, not unlike that set by the trial court.

On April 30, 1998, the board of elections advised the clerk of council that of the original signatures 595 were valid, *i.e.*, signed by registered voters in the affected area. In May 1998, 20 additional withdrawals were filed with council, 19 of which were deemed valid by the clerk of council. After comparing the signatures with the list of resident property owners and accounting for the 19 withdrawals in May, the clerk of council determined that the petitions contained 401 valid signatures of freehold voters.[2] On December 9, 1998, the clerk of council wrote to the state auditor, seeking a statement of township indebtedness in order to allocate the indebtedness to the new township and to the village. On February 1, 1999, council voted to hold a public hearing on March 15, 1999, to discuss the petition to erect a new township.

Just prior to the March 15 hearing, 54 more signed withdrawals were filed with the council.[3] The Summit County Prosecuting Attorney advised council that the instant meeting constituted "official action" that precluded additional withdrawals of signatures. Council decided to continue the hearing until April 6, 1999, and to allow comments and information to be submitted on the issue for another ten days. On March 16, 1999, 8 more signed withdrawals were filed with council.[4]

On June 7, 1999, council issued an order denying the petition, finding that the petition contained 282 valid freehold signatures, short of the required majority of 360 votes of the total 719 freehold voters. On July 7, 1999, CFC filed an administrative appeal in the Summit County Court of Common Pleas, pursuant to R.C. Chapter 2506. CFC also brought an action in declaratory judgment asking the trial court to find that there were sufficient valid signatures and that pursuant to R.C. 503.09, council was required by law to order the erection of a new township. The village sought leave to intervene as a party.

The parties filed stipulations of facts, and concluded that the legal issue to be determined was when the council took "official action" relative to the petition, such that withdrawals of signatures were no longer permitted. After a hearing,

---

2. According to the judgment entry of the common pleas court, the clerk of council initially certified the 401 number to council on November 30, 1998. After scouring the record, this court is unable to find the November 30, 1998 document. The lower court wrote that the same number was certified initially on November 30, 1998, and again on March 15, 1999. The record before this court contains only the certification dated March 15, 1999, which does indeed certify the number of valid signatures as 401. Council's argument to the common pleas court presumed that no official action took place until November 30, 1998, at the earliest.

3. In a separate memorandum dated April 5, 1999, the clerk advised council that these 54 valid withdrawals were filed with council on March 11 and 15, 1999. However, at no time did the clerk or council consider these additional 54 withdrawals in computing the final count of valid petition signatures.

4. No determination was ever made whether these were valid withdrawals.

the court of common pleas issued its decision, finding that the "official action" occurred on April 22, and April 28, 1998, when the clerk of council "solicited the action" of the county auditor and the board of elections, respectively, to ascertain the number of valid signatures. The court found that any withdrawals after April 22, 1998, were untimely. The court also determined that notwithstanding the parties' stipulations to the contrary, there had been a double count on some of the withdrawals, such that the petition contained valid signatures by 401 freehold voters, more than the required majority of the 360 freehold voters. The court ordered council to issue an order erecting the new township.

Both the council and the village filed timely appeals. Before we address the substance of this appeal, we must address a preliminary issue of whether the village has standing to appeal the lower court's decision.

II

The final judgment appealed from addresses the village as an intervening party. However, the record in the lower court reveals that the court did not issue an order granting the village's motion to intervene. When this court discovered that fact, we ordered the village to show cause why the village has standing to bring its appeal. In response, the village requested leave from this court to apply to the court of common pleas for an order pursuant to Civ.R. 60(A) to correct "a clerical error." This court denied the motion. Our reasoning was twofold.

■■ First, assuming that the lower court intended to permit the village to intervene, it is well established that "a court speaks through its journals and an entry is effective only when it has been journalized." *San Filipo v. San Filipo* (1991), 81 Ohio App.3d 111, 112, 610 N.E.2d 493, 493, citing *State v. Ellington* (1987), 36 Ohio App.3d 76, 77–78, 521 N.E.2d 504, 505–506. Civ.R. 60(A) permits the correction of a clerical error in a final order. This court is unwilling to conclude that the lower court's failure to take a substantive action, such as issuing an order permitting intervention, amounts to a "clerical error."

■■ Second, it is unclear what legal right the village had that would have warranted intervention in this case. R.C. 503.09, the statute at issue here, permits non-municipal township freeholders to petition for secession and the erection of a new township. The statute is designed to permit the non-municipal freeholders to achieve a level of self-government that they do not have as a minority in a township dominated by a municipality. That the residents of the village will no longer be able to be a dominant force in the government of a township, which is a unit of local government completely separate from the

village, disturbs no legal rights previously enjoyed by the village as an entity. The village does not have a legal interest in the outcome of this case.

Thus, even assuming that the lower court intended to allow the village to intervene, this court must conclude that the village has no legal interest to pursue on appeal. This court has denied the village's motion for leave to file a Civ.R. 60(A) motion. We now dismiss the village as a party to this appeal.

The council has assigned one error for our review, which we now address.

### III

Assignment of Error:

"The trial court abused its discretion in determining when official action occurred with a petition filed pursuant to R.C. 503.09, and whether Summit County Council had taken official action such that it could not allow the withdrawal of signatures on November 30, 1998."

■■ We note initially that CFC filed an administrative appeal pursuant to R.C. Chapter 2506. R.C. Chapter 2506 governs appeals from "[e]very final order, adjudication, or decision of any officer, tribunal, authority, board, bureau, commission, department, or other division of any political subdivision of the state." R.C. 2506.01. However, courts have consistently held that an appeal will lie under this statute only from a decision that is quasi-judicial in nature. *M.J. Kelley Co. v. Cleveland* (1972), 32 Ohio St.2d 150, 61 O.O.2d 394, 290 N.E.2d 562, paragraph one of the syllabus. "Proceedings of administrative officers and agencies are not quasi-judicial where there is no requirement for notice, hearing and the opportunity for introduction of evidence." *Id.* at paragraph two of the syllabus.

■ We look to the proceeding at issue here, the decision of council to deny the petition, and we find that R.C. 503.09 *et seq.*, governing the erection of a new township under these circumstances, does not require notice, a hearing or the opportunity for the introduction of evidence. The statute merely requires the council to ascertain the number of valid freehold signatures. See discussion, *infra*. Given that analysis, we find that an administrative appeal pursuant to R.C. Chapter 2506 does not lie from the action of council in this matter.

■ However, CFC filed an action in declaratory judgment, asking the court to determine the official action that precluded any further withdrawals of signatures, and to determine that there were sufficient signatures to warrant the erection of the new township. It is the lower court's declaratory judgment that we review. We conduct a *de novo* review of the lower court's legal determinations as to what constitutes an "official action" and whether council must proceed

to erect a new township. See *Long Beach Assn., Inc. v. Jones* (1998), 82 Ohio St.3d 574, 576, 697 N.E.2d 208, 209–210, citing *Ohio Bell Tel. Co. v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 145, 147, 593 N.E.2d 286, 287.

R.C. 503.09 governs the erection of a new township by a petition process. The statute itself is quite brief, reading in its entirety:

"Where a township contains a municipal corporation, either in whole or in part, if a majority of the freehold electors owning land in the portion of such a township outside the municipal corporation's corporate limits, petitions, with a map accurately setting forth such territory, praying to have such territory erected into a new township, and excluding the territory within the municipal corporation, the board of county commissioners shall enter an order erecting such territory into a new township, the boundaries of which need not include twenty-two square miles of territory. Upon the erection of such new township, the territory lying within the limits of the municipal corporation in the original township shall be considered as not being located in any township." R.C. 503.09.

The statute directs that if the council[5] is presented with a petition to erect a new township, signed by a majority of the freehold electors in the territory to be newly established as a township, the council's sole duty is to enter an order to erect the new township.

The common pleas court reviewed the case law dealing with similar statutes involving annexation and the steps inherently necessary for actually erecting the new township. The court then determined that the clerk of council's letter of April 22, 1998, soliciting the assistance of the county auditor, constituted "official action" by the council. The court then reasoned that, pursuant to *Chadwell v.. Cain* (1959), 169 Ohio St. 425, 8 O.O.2d 449, 160 N.E.2d 239, no withdrawals could be considered if submitted after council's "official action." The court further determined that (1) 119 withdrawals were improperly counted,[6] resulting in an undercount of votes; (2) no withdrawals submitted after April 22, 1998, could be considered; and (3) consequently, there were more than the required majority of 360 valid freehold signatures.

We turn first to *Chadwell* to determine whether that case supports the trial court's decision, and we conclude that it does. The Supreme Court in *Chadwell* reviewed the history of Ohio case law governing the right of a voter to withdraw his or her signature from a petition directed to compelling state officials to take

---

5. Summit County is governed not by a board of commissioners but by a county council. See R.C. 302.01.

6. The 100 withdrawals both deleted from the petitions and then also withdrawn, plus the 19 late withdrawals submitted in May 1998.

official action. *Chadwell* itself dealt with a statute that involved annexation of a territory to a city or village. The Supreme Court held that, absent statutory provisions to the contrary, the common-law rule applies, permitting a petitioner the "right to withdraw his name from such petition at any time before official action has been taken thereon." *Id.* at paragraph one of the syllabus, citing *State ex rel. Kahle v. Rupert* (1918), 99 Ohio St. 17, 122 N.E. 39. See, also, *Lynn v. Supple* (1957), 166 Ohio St. 154, 140 N.E.2d 555, paragraph two of syllabus. The Supreme Court determined that in the annexation process at issue in *Chadwell,* when the board of county commissioners adopted a formal order fixing a date for a public hearing on the petition, that act constituted "official action." The court reached this conclusion because the setting of a hearing date was an action "essential to the statutory processes of granting or denying such petition." *Chadwell* at paragraph two of the syllabus.

 In the instant case, the lower court concluded that because council necessarily had to seek a determination on the validity of the petition signatures, as a preliminary measure for determining its jurisdiction to consider the petition, this action constituted "official action" precluding any further withdrawals of signatures. This court agrees. Unlike R.C. 503.09, the annexation statute in *Chadwell* actually required the board of county commissioners to hold a public hearing on the petition "not less than 60 days after * * * filing [the petition]." *Id.* at 432, 8 O.O.2d at 453, 160 N.E.2d at 245. That statute mandated that the board could vote to annex the territory or to deny the annexation petition only after holding a public hearing on the petition. *Id.* at 433, 8 O.O.2d at 453–454, 160 N.E.2d at 245–246. The Supreme Court in *Chadwell* found that "affirmative administrative action by [the board] * * *, which action is essential to the statutory process of granting or denying such petition, constitutes 'official action.' " *Id.* at 438, 8 O.O.2d at 456, 160 N.E.2d at 248.

Unlike the statute involved in *Chadwell,* R.C. 503.09 requires no action by council except to enter an order to erect the township or to deny the petition. Nor does council have any discretion in entering an order, once it is ascertained that there are sufficient valid signatures on the petition. On April 22, 1998, the clerk of council solicited the assistance of the county auditor to determine the number of freeholders in the affected area, to determine the number of signatures needed to constitute a majority. This action constituted the initial "official action" that was sufficient to preclude further withdrawals of signatures from the petition for the new township. The lower court stated that "[t]he statute at issue here is not one which requests or requires legislative action." This court agrees. The clerk's request for a count of the signatures may constitute a ministerial step in the process of erecting a new township. However, the instant statute requires of council no other action than determining the vote count and entering an order

to erect a new township if there were sufficient signatures. Once sufficient signatures were submitted, council had no discretion in entering the order.

This court concludes as a matter of law that when council sought a certification of the number of valid signatures on the petition on April 22, 1998, signatories no longer had right to withdraw their signatures. Any withdrawals after that date were not valid.

We now review the lower court's determination that as of this date there were sufficient signatures on the petition to require council to erect the new township. Our review of the evidence submitted indicates that there were 708 original signatures. There were 100 withdrawals filed with council before the clerk sent the petitions to the board of elections on April 28, 1998.[7] For each withdrawal filed before April 28, 1998, the signature was deleted from the petition itself even before the clerk of council sent the petitions to the board of elections.[8] It is clear that the names so "deleted" were never counted as a signature in the initial tally. In other words, no determination was ever made whether a signature, so deleted, was that of a registered freehold voter. Thus, on April 30, 1998, the board of elections determined that the petitions submitted contained 608 signatures.[9] The board of elections further determined that after deducting for duplications and nonregistered signatures, there were 595 signatures by registered voters in the portion of the township seeking secession.

In May 1998, 20 more valid withdrawals were submitted, 19 of which the clerk of council determined to be valid withdrawals. On March 15, 1999,[10] the clerk of council advised the council by memorandum that the "original petition so referenced above does contain the minimum number of signatures required in O.R.C. 503.09." This conclusion was based on the petition, the auditor's "Integrated Assessment System" listing owners of real property, a list of the mailing addresses for those property owners, and the board of elections' list of registered voters in the affected territory. The clerk of council stated that of the withdrawals submitted, the "[t]otal number of requests for withdrawal found to be in order

---

7. We note that of these 100 early withdrawals, eighteen of them were filed with council on April 27, 1998. Given our determination that the cutoff date for withdrawals was April 22, these eighteen withdrawals were untimely and should have been disregarded. It is not clear that the trial court added back these eighteen withdrawals when it computed the number of valid signatures. However, this does not change the outcome of this case.

8. Cf. footnote 1.

9. This corresponds to the letter from the board of elections of April 30, 1998, stating that the petitions submitted contained 608 signatures, *i.e.*, the 708 as stipulated by the parties, minus the 100 simultaneous withdrawals.

10. Cf. footnote 2, *supra.*

and deleted by Clerk of Council—119." The clerk also stated that the "total number of freehold electors who signed original petition found to be valid by Clerk of Council–401."

At the common pleas court the parties stipulated that there were 401 valid freehold signatures as determined by the clerk of council,[11] but that when 119 valid withdrawals were deducted from this number, "the Petition contained only 282 signatures." The common pleas court determined that, notwithstanding the parties' stipulations of fact to the contrary, there were more valid freehold signatures than the required majority of 360. The lower court concluded, and this court agrees, that the parties' stipulation actually double counted withdrawals submitted prior to April 28, 1998. Thus, when 119 withdrawals were deducted from the tally of 401 valid signatures, which tally never included the 100 signatures later withdrawn, these 100 withdrawals were effectively counted twice, once by deletion from the petition itself, and once by subtraction from the number of "valid signatures."

▮▮▮▮ The lower court rejected the parties' stipulations to the extent they contradicted the clear evidence before the court. Normally, a party may stipulate to facts, whether such facts assist or undercut his case. "It is error for a court to disregard the stipulations of the parties and to decide a civil case on a matter agreed by the parties not to be in dispute, unless there is some fundamental reason in the interest of justice to do otherwise." *Sears Roebuck Co. v. J–Z Realty Co.* (Nov. 2, 1976), Franklin App. No. 76AP–332, unreported. However, the instant stipulations contradict the evidence contained in the actual petitions and withdrawals and in the determination by the clerk of council that there were 401 valid signatures as of March 15, 1999, including the 19 withdrawals submitted in May 1998. If the instant stipulations were allowed to stand, despite clear evidence to the contrary, the rights of the freehold voters of the area seeking secession would be stipulated away. The common pleas court correctly reviewed all the evidence and discounted any stipulation of fact that was clearly contrary to the facts in evidence. We find that the trial court properly concluded that, after correcting for the double counting of withdrawals and the late withdrawals submitted in May 1998, there were more than sufficient valid signatures as of April 22, 1998, for the secession petition to prevail.

Given our determination that withdrawals submitted after April 22, 1998 were untimely, it is clear that there were 438 valid signatures, the 401 count determined by the clerk of council, plus 18 untimely withdrawals filed on April 27, 1998, and 19 untimely withdrawals submitted in May 1998. This is more than the requisite majority of 360 signatures.

---

11. The date of the clerk's determination was not noted by the parties.

Thus, we conclude that the common pleas court properly concluded that council took official action on April 22, 1998, which precluded further withdrawals, and that as of that date there were sufficient valid signatures to require council to erect the new township pursuant to R.C. 503.09 *et seq.*

The council's assignment of error is not well taken, and we overrule it.

## IV

We affirm the decision of the court of common pleas, which ordered the council to proceed with the statutory process to erect a new township.

*Judgment affirmed.*

BATCHELDER, P.J., and WHITMORE, J., concur.

BAIRD, J., concurs in part and dissents in part.

BAIRD, Judge, concurring in part and dissenting in part.

I concur with the decision of the majority to dismiss the village as a party to this appeal on the basis that the village had no legal interest in the outcome of this case. However, I must respectfully dissent from the balance of the majority's opinion.

The court of common pleas determined that "official action" occurred when the clerk of council sought the assistance of the county auditor on April 22, 1998, to count the number of valid signatures. The commencement of the "official action" triggered the point at which withdrawals of signatures could no longer be entertained.

However, as the majority notes, R.C. 503.09 directs the council to enter an order only if there are sufficient petition signatures to support the secession. The council's sole duty is to enter an order to erect the new township. This is the only possible "official action" council can take. Since *Chadwell* permits withdrawals submitted before council's "official action," I believe that withdrawals were valid until council took official action entering an order denying the petition on June 7, 1999.

The Supreme Court's decision in *Chadwell* held that, absent statutory provisions to the contrary, the common-law rule applies permitting a petitioner the "right to withdraw his name from such petition at any time before official action has been taken thereon." *Chadwell* at paragraph one of the syllabus, citing *State ex rel. Kahle v. Rupert* (1918), 99 Ohio St. 17, 122 N.E. 39. The Supreme Court in *Chadwell* found that "affirmative administrative action by [the board] * * *, which action is essential to the statutory process of granting or denying such

petition, constitutes 'official action.'" *Id.* at 438, 8 O.O.2d at 456, 8 O.O.2d 449, 160 N.E.2d at 248. The "official action" precluded further withdrawals. *Id.* at paragraph two of the syllabus. Unlike the statute involved in *Chadwell,* R.C. 503.09 does not explicitly require any action by council except to enter an order to erect the township or to deny the petition. Nor does the action of the clerk of council in the instant case amount to "affirmative administrative action by [the council]."

Although council has no discretion in the matter if a petition is filed that is supported by a sufficient number of valid signatures, council is still required to enter an order erecting the township or denying the petition. No action of council is binding unless it is taken pursuant to an "affirmative vote of a majority of the members." R.C. 302.10. See, also, R.C. 302.12. When the clerk of council contacted other county officials to obtain a count of valid petition signatures, the clerk's actions constituted "'preliminary ministerial steps'" in the process of erecting a new township or denying the petition. See *Chadwell* at 437, 8 O.O.2d at 455–456, 160 N.E.2d at 247–248, quoting *State ex rel. DeConcini v. Phoenix* (1952), 74 Ariz. 46, 243 P.2d 766. Only a vote of council on the petition itself can be construed to be "official action" by council.

I believe that until the council ordered the erection of the new township or denied the petition, signatories had the right to withdraw their signatures. Council entered an order denying the petition on June 7, 1999. Until that date, signers were entitled to withdraw their names from the petition.

Therefore, I must dissent from the majority's opinion.