OPINION
{¶ 1} This timely appeal and cross-appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Both Plaintiff-Appellant/Cross-Appellee, Charles Bechara, and Defendant-Appellee/Cross-Appellant, Kristyn Essad, appeal the decision of the Common Pleas Court, Domestic Relations Division, Mahoning County, Ohio, granting a divorce between the couple. Bechara appeals issues surrounding custody of the parties' minor child. Essad appeals the trial court's decision that certain property was marital rather than separate property.
 {¶ 2} A trial court has broad discretion in custody matters and a trial court does not abuse its discretion when it denies a motion for shared parenting because it appears that parents cannot cooperate. Likewise, a trial court does not abuse its discretion when naming the residential parent by placing emphasis on one or two of the statutory factors when all other factors are equal. Finally, when parents have shown a history of a lack of cooperation and they each provide some third-party day care to the child, the trial court does not abuse its discretion when it decides that each party can choose how it provides day care while that party is exercising his or her parenting time.
 {¶ 3} In order to prove that a gift is separate property, a spouse must show by clear and convincing evidence that the gift was only given to him or her. In this case, the evidence regarding whether Essad's father intended to give the down payment for the marital home to Essad or Essad and Bechara conflicts. Accordingly, the trial court's decision that the property is marital property is not against the manifest weight of the evidence.
 {¶ 4} When a party makes a stipulation, then a trial court can only discount that stipulation for a fundamental reason in the interest of justice. In this case, Essad argues she did not agree to the stipulation contained in the record. But she never voiced her objection to this stipulation, even when she was asked about the nature of that stipulation on cross-examination. Accordingly, the trial court properly relied on that stipulation when dividing the parties' property. For these reasons, the trial court's decision is affirmed.
 Facts {¶ 5} The parties were married on August 14, 1999, and one child was born of that marriage on March 14, 2000. At the time of the marriage, Bechara was living in Columbus, Ohio, but moved to Canfield, Ohio, to live with Essad in her parent's home in March 2000. As a result of his move, Bechara began working for a mall development company out of Westlake, Ohio, a Cleveland suburb. Essad continued to complete her medical residency. Because of their work schedules, the parties arranged for Essad's sister-in-law, Kara Essad, to be the child's babysitter four days a week while Essad's parents watched the child the fifth day of the workweek.
 {¶ 6} In July 2000, the couple bought a home in Youngstown, Ohio, which was a minute's walk from Kara's home. Essad's parents had given their two other children and their spouses $40,000 toward a down payment on their first homes. Since Bechara and Essad lived with her parents following their marriage, Essad's parents decided to give them $30,000 for a down payment. For tax purposes, Essad's parents split the $30,000 into three payments of $10,000. Essad's father gave Essad and Bechara $10,000 apiece and Essad's mother gave Essad the other $10,000. This transaction was memorialized in a gift verification document which listed both Bechara and Essad as the recipients of a $30,000 gift from Essad's parents.
 {¶ 7} The parties had an argument which led to Essad moving out of the marital residence on January 16, 2001, with the child. Essad moved back in with her parents after she left the marital home. The parties initially tried marriage counseling to work through their problems in an attempt to reconcile. Essad felt the counseling was unproductive and that the counselor's recommendations were dangerous to her, so she quit going to counseling. During their separation, the parties repeatedly attempted to reconcile, but could not.
 {¶ 8} In February 2001, Bechara began working for a mall development company based in Tennessee. A condition of his initial employment with that company was that he and his family move to Tennessee by June 2002, a subject he and Essad discussed. But after it became clear that he and Essad were going to divorce, his company agreed to let him live in Ohio for the foreseeable future. Bechara's new job allowed him to work out of his home, but required some travel. When Bechara first began to work for this new company he had to travel relatively often. But the longer he worked with the company, the less he had to travel. By the time of the final divorce hearing, Bechara testified he was only traveling three to four days a month.
 {¶ 9} In the summer of 2001, Bechara had his mother move up from Florida to live with him in the marital residence so his mother could help him with the child. Before this, it appears Bechara saw the child often, but did not keep her overnight a great deal. After his mother moved, Bechara began to keep the child overnight more often.
 {¶ 10} On August 7, 2001, Bechara filed a complaint for divorce and asked to be named residential parent. But he also filed a proposed plan for shared parenting. Essad filed her response on August 20, 2001, also asking to be named the child's residential parent.
 {¶ 11} Bechara and Essad had a couple of serious confrontations both before and after Bechara filed his complaint for divorce. The first one happened towards the end of July 2001. At that time, the child had been with Bechara for several days and Essad hadn't seen the child. Essad called Bechara while he was at the mall and asked to see the child. He agreed and the two met outside the mall. The two got into an argument over various issues regarding the child. Essad was irate and someone called the police. The police sent the parties to their respective homes and let the child go home that night with Bechara.
 {¶ 12} In early August 2001, both Bechara and Essad took the child on vacations. One week Bechara took her to Florida and the next Essad took her to North Carolina. After getting back from North Carolina, Essad kept the child for the short amount of time that was left in the rest of the month. On August 31, 2001, Essad's attorney mailed a letter to Bechara's attorney stating that Essad did not believe a shared parenting agreement was in the child's best interests and that they should follow the standard order of visitation. That same day, Bechara's attorney agreed that the parties would follow the standard order of visitation and assumed that Bechara would be the residential parent.
 {¶ 13} On August 31, 2001, Essad and Bechara exchanged the child. That same day, Bechara informed Kara that he was firing her as the child's babysitter and that his mother would help him watch the child while he worked at home during the week. On September 5, 2001, Essad went to Bechara's residence with some members of her family to exercise parental time with the child. Bechara would not let Essad see the child until she signed a shared parenting agreement. Eventually, the police were called to the residence. While the police were present, Bechara allowed Essad to visit with the child for fifteen minutes. Shortly thereafter, Essad contacted her attorney and moved for a temporary restraining order. The matter was heard by a magistrate on September 12, 2001. In a decision filed on September 14, 2001, the magistrate named Essad as the child's residential parent and imposed a modified version of the court's standard visitation order upon the parties. Essad did not regain custody of the child until September 15, 2001. At trial, Essad testified that at the time, she felt manipulated and was worried that Bechara would withhold the child from her unless she did as he asked.
 {¶ 14} Following the imposition of the temporary custody orders, the parties had additional confrontations when transferring the child. At one point Bechara had Essad's father arrested for assault. Essad also completed her residency and moved into her own home, but had not begun her permanent employment by the time of the final hearing. Over time, the parties were able to transfer the child without confrontation. But Essad complained that she could not contact Bechara on the phone when he had the child and that his mother lied about his whereabouts to Essad.
 {¶ 15} The trial court began hearing the case on May 28, 2002, but was continued to early September 2002. The trial court entered judgment on January 28, 2003. In that entry, the trial court denied Bechara's motion for shared parenting, finding it was not in the child's best interests. It then named Essad as the residential parent and ordered that each party was free to determine whether it would have third-party child care for the child while they were exercising their parenting time. The trial court found that the $30,000 gift from Essad's parents was a gift to the couple, not Essad as an individual, and, therefore, was marital property. Finally, the trial court found that Essad would not be reimbursed for the Blazer which Bechara sold during the marriage since the parties stipulated that they would each retain the money in their Morgan Stanley/Dean Witter accounts. Bechara had deposited the proceeds from the sale into his account. It is from this judgment that each party appeals.
 Child Custody Issues {¶ 16} Bechara's three assignments of error all deal with issues surrounding the custody of the parties' minor child. Bechara has ordered his assignments of error from the more specific to the more general. We will address those assignments of error in reverse order, dealing first with the trial court's more general findings and then with its more specific findings.
 {¶ 17} A trial court has broad discretion when deciding child custody matters in a divorce and its decision will not be reversed absent an abuse of that discretion. Masters v. Masters
(1994), 69 Ohio St.3d 83, 85. An abuse of discretion connotes more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When an award of custody is supported by some competent, credible evidence, that award will not be reversed by a reviewing court as being against the weight of the evidence. Bechtol v. Bechtol
(1990), 49 Ohio St.3d 21, 23. As the Ohio Supreme Court has stated:
 {¶ 18} "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." Miller v. Miller (1988),37 Ohio St.3d 71, 74.
 Shared Parenting {¶ 19} In his third assignment of error, Bechara argues:
 {¶ 20} "The trial court committed an error of law and abused its discretion in precluding an award of shared parenting, which was in the best interest of the subject child, based upon the difficulties in cooperation between the parties."
 {¶ 21} Here, Bechara contends that the trial court's conclusion is against the manifest weight of the evidence for two reasons. First, he claims the evidence demonstrates that the parties can cooperate "within the structures of a shared parenting plan." Second, he believes the evidence overwhelmingly demonstrates that a shared parenting plan is in the child's best interests and that her best interests are paramount to concerns over the parties' ability to cooperate. In response, Essad argues that the trial court considered all the statutory factors when determining whether to award shared parenting, including the factor regarding the parents' ability to cooperate and make decisions jointly with respect to the child. Essad contends that most of these factors demonstrate that this case is not an appropriate case for shared parenting.
 {¶ 22} In any divorce proceeding involving parents of a minor child, the trial court must allocate the parental rights and responsibilities for the care of the minor children of the marriage. R.C. 3109.04(A). If one of the parties requests shared parenting, then the trial court must determine if a shared parenting plan is in the child's best interests. R.C.3109.04(A)(2). If the trial court finds that a shared parenting plan is not in the child's best interests, then it must designate one party as the residential parent and divide the other rights and responsibilities for the care of the child between the parents. R.C. 3109.04(A)(1).
 {¶ 23} In this case, Bechara filed a shared parenting plan with his complaint for divorce. Accordingly, the trial court was obligated to determine whether shared parenting was in the child's best interests. When deciding what type of custody arrangement was in the child's best interests, the trial court must consider the factors in R.C. 3109.04(F)(1). But when the trial court is asked to determine whether shared parenting is in the child's best interests, the trial court must also consider the factors in R.C. 3109.04(F)(2):
 {¶ 24} "(2) In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this section, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:
 {¶ 25} "(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;
 {¶ 26} "(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;
 {¶ 27} "(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;
 {¶ 28} "(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;
 {¶ 29} "(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem." Id.
 {¶ 30} In this case, the trial court's judgment entry examined each of the statutory factors and found that shared parenting is not in the child's best interests. The trial court found that the problem in this case is that the parties "cannot cooperate and get along." It based this conclusion on the following findings:
 {¶ 31} "The Court finds that the past history between the parties has shown that they cannot work together on matters affecting [the child]. The Court finds that parenting times and exchanges of [the child] have been a problem from the very beginning of this case. Prior to any temporary orders regarding the allocation of parental rights and responsibilities, the parties could not cooperate over parenting time and who should have custody of [the child] during this interim period of time until the divorce is granted. This resulted in Plaintiff/Father withholding [the child] from her mother for a period of approximately fifteen (15) days. The Court is deeply troubled by Plaintiff/Father's actions. In fact, Dr. Lynn Ross DiMarzio testified that withholding a child from a parent is a form of parental alienation, to which this Court highly frowns upon.
 {¶ 32} "The Court further finds that many of the parenting exchanges have resulted in the police being called to the parties' homes. Some of these incidents have involved Defendant/mother's parents, one being where her father was arrested for attempted assault against Plaintiff/Father. No evidence was submitted as to whether [the child] was actually present during these altercations; however they have all stemmed over the exercise and/or exchange of her parenting time.
 {¶ 33} "The evidence has shown that even with the simplest of things, the parties cannot cooperate. Telephone contact is encouraged under the Court's standard schedule, yet Defendant/Mother has had much trouble in contacting [the child] while Plaintiff/Father exercises parenting time. The Court finds Defendant/Mother's testimony that she has to appease Plaintiff/Father or else she may not get to talk to [the child] on the telephone to be credible. Plaintiff/Father never testified that Defendant/Mother calls too frequently or at unreasonable times. The Court finds that telephone contact directly relates to one parent's ability to encourage the love and affection between parent and child and is a significant factor supporting shared parenting.
 {¶ 34} "Moreover, the Court is troubled with Plaintiff/Father's unilateral decision-making and lack of notice to Defendant/Mother. Plaintiff/Father made the unilateral decision to fire Kara Essad as [the child]'s babysitter and move his mother here from Florida to care for [the child], without consulting Defendant/Mother. He also removed the child to Florida for seven (7) days without notifying the Defendant/Mother. Including within the Court's Local Parenting Time Schedule, which was implemented by the Court for temporary orders, is the requirement that for travel periods that exceed forty-eight (48) hours, the traveling parent must notify the other parent of such travel plans in writing at least seven (7) days prior to the trip. The notice must include, at a minimum, the scheduled departure and return dates, travel arrangements and a telephone number where the child can be reached in an emergency.
 {¶ 35} "The Court also finds that the parties have not been able to cooperate in matters affecting other areas of their own lives. For instance, Plaintiff/Father did not cooperate with requests for documentation from Defendant/Mother's counsel in a civil lawsuit. This resulted in both parties expending money for attorney fees. Additionally, the parties could not resolve many issues of the property division, some of which are meager, such as $350.00 owed on a couch or a tax refund of $600.00."
 {¶ 36} The trial court's findings are amply supported by the record and Bechara does not challenge these findings. Instead, he argues that the parties' most recent history reflects that the parties have begun to cooperate over issues involving the child. But Bechara's argument belies the evidence in the record.
 {¶ 37} Bechara first argues that the parties have attempted to reconcile their differences numerous times and that these attempts at reconciliation demonstrate that they can cooperate in matters regarding the child. Furthermore, he argues the parties have been able to exchange the child amicably and that Essad has allowed telephone contact between he and the child when Essad is exercising her parenting time. Accordingly, he contends that the trial court's conclusion that the parties cannot cooperate is unfounded.
 {¶ 38} Bechara's argument is supported by the version of events which he testified to at trial. He testified that the parties attempted to reconcile, but "couldn't get it done." He testified that there are no problems exchanging the child when just he and Essad are involved. According to Bechara, he and Essad "talk frequently" and would invite each other over for coffee in the morning so both could be with the child.
 {¶ 39} But Essad's testimony reflects a very different point of view. She admitted that she tried to reconcile with Bechara, but could not. She then specifically stated that she did not believe she could cooperate with Bechara for the purposes of shared parenting. Essad testified that neither Bechara nor his mother answered the phone when she called his home to check on the child. Most importantly, she stated that the reason she had cooperated with Bechara's requests lately is because of her belief that Bechara would withhold the child from her if she did not. Bechara described the summer immediately prior to trial as the time when the parties cooperated the best. Essad testified that "[t]his summer has been horrible" because her separation from the child for a week at a time and her relationship with Bechara. In the portion of the trial court's judgment entry quoted above, the trial court specifically stated that it found Essad's testimony that she had to appease Bechara to see the child was credible.
 {¶ 40} Finally, Bechara mischaracterizes the guardian ad litem's testimony. During that testimony, the guardian ad litem recommended that each party be granted equal parenting time. Bechara's counsel repeatedly attempted to characterize this recommendation as shared parenting, as reflected in the portion of the guardian ad litem's testimony quoted in his brief. But when asked about his recommendation by the court, the guardian ad litem thought it was questionable whether the parties could cooperate given their history and stated that his recommendation of equal parenting time is different than a recommendation of shared parenting. When combining these facts with the findings that Bechara does not challenge, we must conclude that the trial court's conclusion that the parties could not cooperate is supported by competent, credible evidence.
 {¶ 41} Bechara argues that the child's best interests are paramount to the parties' ability to cooperate. In support of this argument, he cites Schmidt v. Schmidt (Apr. 19, 1999), 12th Dist. No. CA98-06-037, and Bruno v. Bruno (Dec. 19, 1997), 6th Dist. No. WD-97-003. But these cases do not say that a trial court abuses its discretion when it refuses to award shared parenting solely because of an inability to cooperate.
 {¶ 42} For example, in Schmidt, the trial court awarded shared parenting. The appellant argues that this was an abuse of discretion since the evidence demonstrated that the parties were unable to cooperate. The appellate court disagreed. "Although there is some evidence of difficulties in cooperation between these parties, we do not find that it is never appropriate to approve a shared parenting plan under such circumstances." Id. at 3.
 {¶ 43} The trial court in Bruno also implemented a shared parenting plan. Citing the trial court's discretion in custody matters, the appellate court affirmed this decision.
 {¶ 44} "A review of the decision shows that the magistrate acknowledged several times that the parties were having problems communicating but concluded that shared parenting nevertheless remained in Krysten's best interest. Accordingly, we find that the trial court's denial of appellant's motion to designate him the sole residential parent was not unreasonable, arbitrary or unconscionable and therefore was not an abuse of discretion." Id. at 2.
 {¶ 45} These cases are distinguishable from this case because in each of those cases the appellate court was asked to say that implementing a shared parenting plan was an abuse of discretion. In this case, this court is asked whether not implementing a shared parenting plan is an abuse of discretion. Accordingly, they are not particularly helpful.
 {¶ 46} While Bechara argues that shared parenting would be in the child's best interests, this can only be the case if there is a successful shared parenting arrangement. "Successful shared parenting requires at least two things. One is a strong commitment to cooperate. The other is a capacity to engage in the cooperation required. The R.C. 3109.04(F)(2) factors measure both components." Meyer v. Anderson, 2nd. Dist. No. 01CA53, 2002-Ohio-2782, ¶ 25. In this case, the trial court's extensive findings are supported by competent, credible evidence and those findings support its decision not to implement a shared parenting plan. Accordingly, the trial court did not abuse its discretion when it denied Bechara's request for shared parenting. His third assignment of error is meritless.
 Residential Parent {¶ 47} In his second assignment of error, Bechara argues:
 {¶ 48} "The trial court committed an error of law and abused its discretion in finding mother as the more suitable residential parent of [the child] rather than father, based upon the evidence presented."
 {¶ 49} Here, Bechara contends that the evidence presented at trial overwhelmingly demonstrates that he should have been designated residential parent. Since the trial court rejected his proposal for shared parenting, it had to designate a residential parent. The trial court designated Essad as the residential parent based largely upon some of Bechara's "past actions and how they indirectly impact on his parenting choices." It then goes on to list four sets of actions which it found troubling.
 {¶ 50} Bechara argues that the evidence demonstrates the good relationship he has with the child and his ability to care for the child. He then contends that a review of the record will demonstrate that the trial court's concerns over the incidents it lists do not substantiate the trial court's concerns about Bechara's parenting abilities. Finally, he points to evidence in the record which allegedly reflects poorly on Essad's parenting ability. In response, Essad applies the facts to each of the statutory factors. She argues that applying all of these factors to the facts at hand demonstrates that she was the best choice for residential parenting status.
 {¶ 51} When a court is determining who should be a minor child's residential parent, it must look to the factors in R.C.3109.04(F)(1):
 {¶ 52} "In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
 {¶ 53} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 54} "(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 {¶ 55} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 56} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 57} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 58} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 {¶ 59} "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 {¶ 60} "(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 {¶ 61} "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 {¶ 62} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state." Id.
 {¶ 63} The trial court made extensive findings on each of the statutory factors. Based on these factors, the trial court found that each party was a good parent and did not question the care the child received while in their care.
 {¶ 64} "The determinative factor to the Court, to which this Court cannot ignore, are some of Plaintiff/Father's past actions and how they indirectly impact on his parenting choices. As previously set forth, the Court is troubled by Plaintiff/Father withholding [the child] from her mother for fifteen (15) days. Plaintiff/Father has used the child to get what he wants, such as when he threatened Defendant/Mother with not seeing [the child] unless she signed a shared parenting plan. The Court is also troubled by Plaintiff/Father taking [the child] to Florida for seven (7) days without notifying Defendant/Mother. The Court finds that Plaintiff/Father has not fostered telephone contact between mother and daughter, nor has he sought her input on matters affecting [the child]'s care, such as her daycare provider. The Court has concerns that if Plaintiff/Father is designated residential parent, he will continue with these actions to the detriment of Defendant/Mother.
 {¶ 65} "The Court is certainly not trying to cast Plaintiff/Father in a bad light. Defendant/Mother also shares some of the blame and has caused her share of problems. For example, Defendant/Mother has allowed her parents to become too involved in her life with Plaintiff/Father and [the child]. However, the Court finds that Defendant/Mother has better fostered the love and affection between father and daughter while also complying with Court ordered parenting time."
 {¶ 66} When viewing the evidence as a whole, we cannot conclude the trial court abused its discretion when it named Essad as the child's residential parent. Most of the statutory factors demonstrate that Bechara and Essad are equally capable of being the child's residential parent. Each parent wishes to be named as the child's residential parent. The child's age prevented an in camera interview to ascertain her wishes. By all accounts the child interacts well with each parent and with each parent's extended family. The child is not yet of school age and interacts well with the children in each parent's community. The parties are in good mental and physical health. Neither parent has been convicted of any criminal offense involving the child being determined to be abused or neglected. The trial court found neither party wishes to establish a residence in another state.
 {¶ 67} The trial court found the incident where Bechara withheld the child from Essad was significant and, given the remaining factors, it appears reasonable for it to do so. The incident reflects poorly on Bechara's ability to honor and facilitate parenting time rights and shows a past denial of parenting time rights. In addition, Bechara had a child support arrearage at the time of the final hearing. He argues that arrearage is administrative in nature due to the retroactive nature of the temporary child support award. But this is a factor the court could consider.
 {¶ 68} As can be seen, all the factors which don't apply equally to the parties all weigh in favor of naming Essad as residential parent. Bechara argues that his stable work situation and the evidence of how well he interacts with the child demonstrate that he should be the child's residential parent. But the trial court reasonably concluded that Bechara's attempt to manipulate Essad by withholding the child was a more important consideration. Given the broad discretion the trial court has in custody matters, we cannot say it abused its discretion when it named Essad as the child's residential parent. Bechara's second assignment of error is meritless.
 Day Care {¶ 69} In his first assignment of error, Bechara argues:
 {¶ 70} "The trial court committed an error of law and abused its discretion in permitting mother to utilize a third party for day care of the subject child rather than father, who works out of his home and is available to care for the child."
 {¶ 71} Here, Bechara argues that the trial court abused its discretion when it found that each party could determine whether to allow third-party day care while they were exercising their parenting time with the child. Bechara testified that he worked out of his home and could care for the child as he did so. He contends that parental care is always better for a child than third-party care. In response, Essad argues that the evidence demonstrates that although Bechara works from home, he also has a third-party watch the child. According to Essad, Bechara began to exercise more parenting time with the child after his mother moved to his home. She argues that his mother is providing third-party care in the same way that Kara provided third-party care.
 {¶ 72} Neither party relies on any substantive law when arguing this assignment of error. Essentially, this is because this is a situation largely within the trial court's discretion. When addressing this issue, the trial court made the following findings:
 {¶ 73} "The Court finds it necessary to address a significant concern of Plaintiff/Father. The Court finds that Plaintiff/Father criticizes Defendant/Mother, Magistrate Kaufmann, and this Court in allowing a third party to baby-sit [the child] rather than being with him. While the Court certainly sympathizes with Plaintiff/Father's desire to be with his child as much as possible, the Court finds his criticism unfounded. The Court finds that Plaintiff/Father has a very unstructured work schedule, where he is frequently out of town on travel. While Plaintiff/Father does have his mother present for child-care, the Court sees no difference and gives no preference to letting a grandmother watch [the child] rather than an Aunt.
 {¶ 74} "Even if [the child] is present with him on a daily basis, he still has to work out of his home. Certainly, during these times, he cannot devote his full attention to her needs. Third party care would be required. Ultimately, the Court finds that Plaintiff/Father is criticizing his wife for doing the same conduct he is partaking in; that is, leaving his child with a third party.
 {¶ 75} "On one hand, Plaintiff/Father wants to have [the child] with him rather than a third-party babysitter and criticizes Defendant/Mother for not allowing this additional time. On the other hand, Plaintiff/Father does not offer Defendant/mother to have [the child] when he is out of town. Plaintiff/Father is not living up to his own standards.
 {¶ 76} "Furthermore, while the above parenting time schedule may result in the child being placed with a third-party caregiver, the Court finds that no situation is perfect. The Court would like to envision a situation where the parties would be able to work something out when it came to third-party care, but given their history of lack of cooperation and lack of communication, this may not be possible. As a result, and as recommended by the Guardian Ad Litem, when either party exercises parenting time, that parent is free to determine the third party child care for the child."
 {¶ 77} We cannot explain the situation any better. At the final hearing, Bechara admitted that he moved his mother to his home to help him with [the child]. He testified that his mother put [the child] down for naps and washed her clothing. In addition, Bechara's mother watched [the child] whenever Bechara was not home. Furthermore, based on the facts of the case, the guardian ad litem recommended that each party decide how they would provide day care for the child.
 {¶ 78} The trial court was correct when it found that Bechara was criticizing Essad for the same type of behavior that he was engaged in. And it was reasonable for the trial court to conclude that Bechara would not be able to devote his full attention to [the child] during the day while he is working. The trial court made a well-reasoned decision regarding this issue based upon competent, credible evidence and therefore did not abuse its discretion. Bechara's first assignment of error is meritless.
 Gift as Separate or Marital Property {¶ 79} In the first of two cross-assignments of error, Essad argues:
 {¶ 80} "The trial court erred when it found that a $30,000 gift from Kristyn Essad's parents was not her separate property."
 {¶ 81} Essad contends that she proved that the gift was separate property by clear and convincing evidence through her testimony, her father's testimony, and a "clear paper trail." Bechara argues that Essad's evidence is contradictory and, therefore, she failed to prove that this gift was her separate property.
 {¶ 82} Generally, this court reviews a trial court's property division in divorce proceedings for an abuse of discretion.Cherry v. Cherry (1981), 66 Ohio St.2d 348. But under R.C.3105.171 the characterization of property as separate or marital is not discretionary; rather it is a mixed question of law and fact. See McCoy v. McCoy (1995), 105 Ohio App.3d 651, 654;Kelly v. Kelly (1996), 111 Ohio App.3d 641. An initial determination by a trial court that an asset is separate or marital property is a factual finding that will not be reversed unless it is against the manifest weight of the evidence. Okosv. Okos (2000), 137 Ohio App.3d 563, 583. Judgments supported by some competent, credible evidence will not be reversed as against the manifest weight of the evidence. Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80. Once the characterization has been made, the actual distribution of the asset may be properly reviewed under the more deferential abuse-of-discretion standard. R . C. 3105.171(D); Blakemore v.Blakemore (1983), 5 Ohio St.3d 217.
 {¶ 83} Pursuant to R.C. 3105.171(B), a trial court must classify property as either marital or separate before dividing that property. When the parties contest whether an asset is marital or separate property, the presumption is that the property is marital, unless proven otherwise. Sanor v. Sanor,
7th Dist. No. 2001 CO 37, 2002-Ohio-5248, ¶ 53. The burden of tracing separate property is upon the party claiming its existence. DeLevie v. DeLevie (1993), 86 Ohio App.3d 531, 536. Moreover, the party must prove by clear and convincing evidence that it was given to only him or her. Eikleberry v. Eikleberry
(Jan. 7, 2002), 7th Dist. No. 00 BA 13; R.C.3105.171(A)(6)(a)(vii). "The gift exception in division (A)(6)(a)(vii) requires proof that not only did the donor intend to benefit one of the spouses, but that the donor also intended to exclude the other spouse from acquiring any interest in the property through the gift that was made." Marshall v. Marshall
(May 4, 2001), 2nd Dist. No. 2000 CA 95, at 2.
 {¶ 84} Clear and convincing evidence means that degree of proof which will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.Cincinnati Bar Assn. v. Massengale (1991), 58 Ohio St.3d 121,122. It is the measure or degree of proof that is more than a mere preponderance of the evidence, but less than the extent of certainty that is required for proof beyond a reasonable doubt.Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 85} In this case, the trial court found that the testimony and exhibits were inconsistent. Because the evidence was contradictory, it refused to find that the $30,000 was given solely to Essad. Accordingly, it found that this property was marital property. Based on the evidence, this conclusion is not against the manifest weight of the evidence.
 {¶ 86} In 1991, Essad's father received a substantial bonus at work when he was promoted and he invested that bonus so he could give his three children the down payments for their homes when they got married. The first two children and their spouses each received $40,000 towards their down payments, but he only gave Essad and Bechara $30,000 since they lived at his house for free for a few months following their marriage. On the advice of his tax adviser, Essad's father split the gift into three $10,000 portions. He and his wife each gave Essad a check for $10,000 and Essad's father gave Bechara a check for $10,000.
 {¶ 87} Essad's father testified that he talked to Bechara before he wrote the checks and told him that the only reason he was writing a check to Bechara was so that Bechara and Essad did not have to pay taxes on the gift and that otherwise he would not give Bechara the money. According to Essad's father, he intended for the whole gift to be solely for Essad. But the bank was apparently not informed of this intention since its gift verification form listed Essad's parents as the donors and both Essad and Bechara as the donees.
 {¶ 88} Essad argues this evidence shows that her father intended for the $30,000 only to be given to her. But as Bechara points out, Essad's father contradicts himself in his testimony. He clearly says that he intended for the gift to be solely for Essad's benefit. But when describing why he was lowering the amount of the gift from $40,000 to $30,000, Essad's father stated that "they" saved money by living with him, "so we only gave them 30,000" and stated that Bechara knew "why I wasn't giving him $40,000 like I did the other two." These references to the gift going to "him" or "them" indicates that Essad's father recognized that he intended to give the gift to both Bechara and Essad. On cross-examination, Essad's father admitted that the money was given to both Essad and Bechara.
 {¶ 89} In addition to this contradictory testimony, the documentary evidence indicates that the gift was both to Essad and Bechara. Essad's parents wrote checks to Essad and Bechara as individuals. The gift verification form indicates that the gift was to both Essad and Bechara.
 {¶ 90} We acknowledge that the evidence in this case is contradictory. However, the burden is upon Essad to prove that the gift was separate property by clear and convincing evidence. Given the fact that the evidence in this case is conflicting, we can find no fault in the trial court's decision that Essad failed to meet her burden of proof. Weight of the evidence and credibility of witnesses are issues to be determined by the trial court as the trier of fact. Jacobs v. Jacobs, 4th Dist No. 02CA2846, 2003-Ohio-3466, ¶ 31. Additionally, parents have a natural bias toward their children. Chase-Carey v. Carey (Aug. 26, 1999), 5th Dist. No. 99CA1. Accordingly, the trial court was not required to find that Essad's father was credible when he testified that he intended the gift to be for her alone. Because of the conflicting nature of the evidence, our deference to the trial court's role as the fact-finder, and the fact a party must prove that an inter vivos gift is separate property by clear and convincing evidence, we cannot reverse the trial court's finding in this regard. Essad's first assignment of error is meritless.
 Vehicle Proceeds as Separate Property {¶ 91} In her second cross-assignment of error, Essad argues:
 {¶ 92} "The trial court erred when it failed to grant Kristyn Essad's separate property claim regarding her 1996 Chevrolet Blazer."
 {¶ 93} The evidence demonstrates that the Blazer was Essad's separate property and that during the marriage Bechara sold the Blazer and deposited the proceeds in his Morgan Stanley/Dean Witter account. During trial the parties made the following stipulation: "Both parties' Morgan Stanley/Dean Witter accounts, each party will retain the account — moneys that are in each of their accounts." But after making this stipulation, Essad introduced evidence in an attempt to demonstrate that the Blazer was her separate property and that the proceeds from its sale could be traced to Bechara's account.
 {¶ 94} Essad claims that she only stipulated that each party would retain their accounts in their individual names, not that those funds were clear from any separate property claim. In the alternative, Essad contends that the general stipulation regarding those accounts should not take precedence over her specific request for the separate property. In response, Bechara argues that Essad clearly and repeatedly stipulated that each party's Morgan Stanley/Dean Witter accounts were free from the claims of the other party. In addition, Bechara contends that Essad's claim must fail since she did not prove that the proceeds from the Blazer's sale did not go to meet marital expenses.
 {¶ 95} A stipulation is a "voluntary agreement between opposing parties concerning disposition of some relevant point." Black's Law Dictionary (7th Ed. 1999), 1427; Burdge v. Bd. ofCty. Commrs. (1982), 7 Ohio App.3d 356, 358. Generally, a party may stipulate to facts even if that stipulation assists or undercuts her case. Citizens for Choice v. Summit Cty. Council
(2001), 143 Ohio App.3d 823, 833. "A stipulation, once entered into, filed and accepted by the court, is binding upon the parties and is a fact deemed adjudicated for purposes of determining the remaining issues in the case." Whitehall ex rel.Fennessy v. Bambi Motel (1998), 131 Ohio App.3d 734, 742. A party cannot unilaterally retract or withdraw from a stipulation after agreeing to it. Id.
 {¶ 96} "`It is error for a court to disregard the stipulations of the parties and to decide a civil case on a matter agreed by the parties not to be in dispute, unless there is some fundamental reason in the interest of justice to do otherwise.'" Citizens for Choice at 833, quoting Sears RoebuckCo. v. J-Z Realty Co (Nov. 2, 1976), 10th Dist. No. 76AP-332. For instance, if parties stipulate to a fact but the evidence clearly demonstrates the contrary, the trial court may properly discount the stipulation. Id.
 {¶ 97} Essad relies on Beyer v. Miller (1951),90 Ohio App. 66, for the proposition that a court will not construe a stipulation to admit a fact which is obviously intended to be controverted. She argues that this court must look to the entire trial to see whether she intended to stipulate that she had no claim on any of the money in Bechara's Morgan Stanley/Dean Witter account.
 {¶ 98} In Beyer, one of the main issues at trial was whether the plaintiff owned a particular vehicle. At trial, the defendant argued that the plaintiff did not. After the trial court ruled against him, the defendant filed a bill of exceptions when it appealed the trial court's decision. That bill of exceptions did not mention that the parties made any stipulations in the trial court. The plaintiff objected to this bill of exceptions "because it failed to include this language: `It is agreed by and between the parties that the agreed amount of damages to the plaintiff's car was $400.'" Id. at 68. The trial court agreed and ordered the stipulation included in the bill of exceptions.
 {¶ 99} The appellate court was asked to decide whether the parties only stipulated to the value of the car or whether this was also a stipulation that the car was the plaintiff's car. It found that one of the main points of litigation was over the ownership of the vehicle. The defendant had denied this point in his answer and presented many witnesses challenging this conclusion. Accordingly, it concluded that the parties could not have intended to stipulate that the plaintiff was the owner of the car.
 {¶ 100} This case differs from Beyer in an important way. InBeyer, the ownership of the car was a key point in the litigation. Here, the issue of whether this property is marital or separate property is a small part of the entire case. The trial court's discussion of the issue totals less than one page out of a fifty-one page journal entry. The parties had many issues they needed resolved, including custody of the minor child, child support, separate property claims, and the division of the marital property.
 {¶ 101} But the fundamental claim in both Beyer and this case are the same. In each case the appellant is claiming that the stipulation does not mean what it appears to say. In other words, the claim is basically, "I didn't mean to say that." At a certain level, this is why courts have found that a stipulation is binding unless there is some fundamental reason in the interest of justice to do otherwise. See Citizens for Choice at 833.
 {¶ 102} Here, there is not a fundamental reason in the interest of justice to disregard the stipulation or interpret it in a way other than stated in the record. When Bechara's attorney first presented the stipulation to the trial court he stated that the parties agreed that they would each retain moneys that are in their accounts. Later, during Essad's testimony, Bechara's attorney asked her if she remembered stipulating that each party would retain their accounts free and clear of any claim of the other party. Essad said that she remembered making this stipulation. Neither Essad nor her attorney ever objected to this characterization of the stipulation. Given the record, Essad's belated argument that she did not intend to make that stipulation is meritless. If she intended to stipulate to something other than that which is on the record, then she should have preserved some indication of that intent. Essad's second assignment of error is meritless.
 Conclusion {¶ 103} In conclusion, each of Bechara's assignments of error are meritless due to the broad discretion the trial court has in custody matters. In addition, Essad failed to demonstrate by competent, credible evidence that the gift from her father was hers alone. Essad cannot demonstrate that there is a fundamental reason in the interest of justice to disregard her stipulation that each party would retain the money in their Morgan Stanley/Dean Witter accounts. Therefore, Essad's assignments of error are also meritless.
 {¶ 104} Accordingly, the judgment of the trial court is affirmed.
Waite, P.J., concurs.
Donofrio, J., concurs.