JOURNAL ENTRY AND OPINION
{¶ 1} Defendant, Joseph Weinpert, appeals the trial court's judgment[1] that he breached a non-competition agreement ("Agreement") with plaintiff-American, American Logistics Group, Inc. ("American"). Weinpert further appeals the trial court's judgment in favor of American in the amount of $45,842.19.
 {¶ 2} In its cross-appeal, American appeals the trial court's determination that it suffered only $45,842.19 in damages. American also appeals the trial court's judgment that it was not entitled to punitive damages.
 {¶ 3} Weinpert was employed by American from 1997 to March 2, 2001. As part of his employment, Weinpert executed the one-year Agreement which prohibited him from competing with American at any time during his employment. The agreement also prohibited Weinpert from competing with American for one year after he left American's employ.
 {¶ 4} In direct contravention of his Agreement, however, Weinpert secretly operated a business known as Professional Grade Macros ("PGM") out of his home while he worked for American. After he left American's employment, Weinpert continued to compete with American by providing consulting services to several clients, many of whom had been American's clients.[2]
 {¶ 5} American filed suit against Weinpert for breach of the Agreement. The case proceeded to a bench trial, after which the trial court rendered its verdict in favor of American. Weinpert timely appealed and American cross appealed.
A. Weinpert's Assignments of Error
 {¶ 6} Weinpert presents five assignments of error, the first of which follows:
"I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY FAILING TO CONSIDER THE STIPULATION OF THE PARTIES THAT WEINPERT ADVANCED EXPENSES TO HIS CLIENTS DURING THE RELEVANT TIME PERIOD OF $31,206 AND THAT THIS AMOUNT WAS NOT TO BE CONSIDERED IN ASSESSING DAMAGES."
 {¶ 7} Weinpert argues that the trial court erred by including the stipulated sum of $31,206 in its computation of American's damages. According to Weinpert, the parties stipulated during trial that $31,206 was not to be included as part of American's damages, because it represented reimbursable advances Weinpert made to one of his clients, Eastgate Cleaners, dba Al and Fran Cleaners ("Eastgate") for equipment purchases.
 {¶ 8} "It is error for a court to disregard the stipulations of the parties and to decide a civil case on a matter agreed by the parties not to be in dispute, unless there is some fundamental reason in the interest of justice to do otherwise." Sears Roebuck Co. v. J-Z Realty Co.,
1976 Ohio App. LEXIS 7709 (Nov. 2, 1976), Franklin App. No. 76AP-332, unreported." Citizens for Choice v. Summit County Council (2001),143 Ohio App.3d 823, 833, 759 N.E.2d 398. However, where the parties' stipulations contradict the evidence presented in a case, the trial court is under no obligation to honor the stipulations made. Id.
 {¶ 9} In the case at bar, Weinpert contends that
"the parties clearly stipulated that the total amount earned by Weinpert during the twelve months subsequent to his resignation from American was not $135,842.17, but rather was $104,636.17, as $36,102 [sic] of the former figure represented equipment reimbursement and not income. American's counsel stated on the record that Weinpert was entitled to a "deduction" for the amounts he spent on business equipment."
Weinpert's Brief on Appeal, at 10-11.
 {¶ 10} Dennis Palmer, co-owner of Eastgate Cleaners, stated that he had been doing business with Weinpert since 1997. He identified Plaintiff's Exhibit 7 as a summary of payments made to Weinpert for computer consulting services and computer software he sold to Eastgate. Palmer further stated that all the payments made to Weinpert as reflected on Exhibit 7 were made to him individually, not as an employee of American.
 {¶ 11} Palmer also identified Plaintiff's Exhibit 12 as invoices received from Weinpert for his various services. According to Palmer, part of Exhibit 7 and all of Exhibit 12 collectively represent invoices received from Weinpert and the company's corresponding payments to him on those invoices.
 {¶ 12} Palmer further explained what Exhibits 7 and 12 included.
Q: Mr. Palmer, is it a fair statement to say that all of these services consisted of computer-related services?
A: Yes.
Q: That's all he was doing for you, computer consulting, correct?
A: Computer consulting, until we got to the point where we installed new systems at other stores.
Q: Okay.
A: You know, we ended up purchasing I believe it was three other locations during the period of time in question.
Q: So your business expanded by three stores?
A: Yes, we ended up duplicating the system that we had in the original stores in those other stores.
Q: Who duplicated the system for you?
A: Mr. Weinpert. You know, we purchased the hardware from him and, you know, he installed the software.
Tr. 112-113.
 {¶ 13} During cross-examination, Palmer further described Eastgate's business dealings with Weinpert:
Q: Did Mr. Weinpert ever purchase hardware and software for you?
A: Hardware, yes.
Q: If you could refer to Exhibit 13 for me. Is there anything in that document that shows the purchase of hardware and software and the amounts corresponding to that purchase?
A: Well, I believe some of the, you know, larger invoices here in 2000 and 2001, you know, would have covered the, you know, hardware and software purchases.
Q: So the truth is what's contained in Exhibit 13 is not payments for just consulting services but also for reimbursement of the purchase of hardware and software?
A: Oh, definitely, yes.
Q: And you subsequently reimbursed Mr. Weinpert for that purchase; is that correct?
A: That's correct.
Q: Do you know how much approximately that reimbursement was?
A: For the system itself?
Q: Yes.
A: I believe the software was in the neighborhood of $4000 per location and the hardware — it was about in the same neighborhood, so it was probably, you know, 8,000, you know, per location.
Q: And how many locations were there?
A: There were three additional locations added.
Q: That would make it $24,000?
A: That's correct.
Q: Would it surprise you if the total amount of the reimbursement contained in Exhibit 13 is in excess of $32,000?
A: No, no.
Tr. 118-120. Palmer verified that Weinpert created all the software sold to Eastgate. Tr. 120.
 {¶ 14} Cary Root, President of American, testified that Weinpert netted approximately $39,000 from his business dealings with Eastgate in violation of the Agreement. Tr. 252. During Root's testimony, counsel discussed their stipulation on this amount as follows:
MR. READY: Your Honor, we will stipulate it was approximately $39,000 for Al and Fran, to keep this moving.
MR. HABER: Thank you. Do I also have a stipulation that the — that with respect to Al and Fran there was equipment purchases that are part of the $39,000?
MR. READY: Yeah, approximately 31 to 32,000.
MR. HABER: Your Honor, I think we have a stipulation that — I want to make sure it was your number. Is the stipulation that the $39,965 that's in the exhibit —
MR. READY: And equipment, I think, was $31,206. $39,965 is the total gross amount paid by Al and Fran — I'm sorry, by Eastgate Cleaners to Joe Weinpert since 1997. Of that sum, $31,206 represents equipment.
MR. HABER: Thank you Mr. Ready.
* * *
MR. READY: Thank you, your Honor. For the record this morning, before we start with Mr. Totedo, Mr. Sorce and I have a couple of stipulations just to clarify and speed things along. We had stipulated with regard to the totals on Plaintiff's Exhibit 7 on recapitulation on the first page, as well as the authenticity and accuracy of the documents depicted that make up the remainder of that exhibit with the exception of a deduction of 32 — excuse me, $31,260[3] for equipment for Eastgate Cleaners. Plaintiff's Exhibit 7.
THE COURT: Excepting that deduction?
MR. READY: That's correct. We stipulate that that was the amount thatwas spent on equipment purchases. * * * (Emphasis added.)
Tr. 252-253, 327-328.
 {¶ 15} Weinpert insists that the parties' stipulation means that they agreed to allow the trial court to subtract the $31,206 figure as reimbursement and, therefore, as non-income from the amounts Eastgate paid to Weinpert between 1997 and 2002. We disagree.
 {¶ 16} In the record before this court, there is no evidence that the $31,206 was "reimbursement" as characterized by Weinpert. There are no documents proving that Weinpert expended any of his own monies to purchase anything for Eastgate for which he was owed reimbursement. To the contrary, Palmer confirmed that the $12,000 of software sold to Eastgate was created by Weinpert. Weinpert's interpretation of the $31,206 contorts the ordinary and unambiguous meaning of Palmer's testimony and the language of the parties' stipulation.
 {¶ 17} Accordingly, the trial court did not err in determining that $31,206 of the monies Eastgate paid to Weinpert was for software. Accordingly, Weinpert's first assignment of error is overruled.
"II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IMPROPERLY CALCULATING WEINPERT'S SALARY DURING THE RELEVANT TIME PERIOD."
 {¶ 18} Weinpert argues that the trial court erred when it calculated his annual salary at $90,000 at the time he left American. According to Weinpert, when he left American his salary "was at least $92,352, as reflected by Exhibit "N" at trial." Weinpert's Brief on Appeal at 11.
 {¶ 19} Exhibit "N" reveals that the additional $2,352 Weinpert says should be deducted from the trial court's damages calculation is listed in that exhibit as the estimated amount of health insurance to be paid by American during the course of the next employment year. Weinpert fails to cite nor does this court find any authority for including the estimated cost of an employee's annual health insurance plan as part of an employee's annual salary. Moreover, the estimated value of an employee's health insurance plan would not be computed as taxable income of the employee. See, Haynes v. United States, 353 U.S. 81, 1 L.Ed.2d 671,77 S.Ct. 649, (1957), at syllabus.
 {¶ 20} Most fatal to Weinpert's claim that his annual salary should include the $2,352, however, is his own admission that his annual salary was indeed $90,000. Tr. 36, 92.
 {¶ 21} For the foregoing reasons, we find no merit in Weinpert's second assignment of error.
"III. THE TRIAL COURT ERRED BY FAILING TO CALCULATE THE "NET PROFIT" THAT ARGUABLY WOULD HAVE BEEN EARNED BY AMERICAN DURING THE RELEVANT TIME PERIOD, AND INSTEAD ASSESSING DAMAGES BASED SOLELY ON "GROSS REVENUE" GENERATED."
 {¶ 22} Weinpert argues that the trial court incorrectly calculated American's lost profits. In order to recover for lost profits, the aggrieved party must demonstrate such profits "with reasonable certainty." On Line Logistics, Inc. v. Amerisource Corporation, Cuyahoga App. No. 82056, 2003-Ohio-5381, at ¶ 58, citing Gahanna v. EastgateProperties, Inc. (1988), 36 Ohio St.3d 65, 521 N.E.2d 814, paragraph one of the syllabus.
 {¶ 23} The party claiming lost profits must demonstrate "(a) what he [or she] would have received from the performance so prevented, but also (b) what such performance would have cost him [or her] (or the value to him [or her] of relief therefrom). Unless the aggrieved party can prove both of those facts, that party cannot recover as damages the profits he would have earned from full performance of the contract." Id., citingAllen, Heaton McDonald, Inc. v. Castle Farm Amusement Co. (1949),151 Ohio St. 522, 526, 86 N.E.2d 782.
"However, if the aggrieved party would have incurred no additional costs to generate the profits that were lost, then an award based on those figures would not be speculative and, therefore, recoverable.Digital Design, 44 Ohio St.3d at 40-41. "If plaintiff would have been able to perform that work without incurring any additional cost, so that relief from the obligation of performing would not involve any benefit of value to plaintiff, plaintiff might be entitled to * * * [the entire gross profits]." Id., quoting Allen, Heaton McDonald, Inc.,151 Ohio St. at 525."
Id.
 {¶ 24} In the case at bar, there was unrebutted evidence that while he worked for American and during the year after he left the company, Weinpert, acting as PGM, billed and received $135,842.17 from his private clients. Plaintiff's Exhibits 7, 8 and 9; Tr. 73-80.
 {¶ 25} Despite Plaintiff's Exhibits, Weinpert maintains that American failed to prove its lost profits to a reasonable degree of certainty. He argues that while he secretly operated as PGM, American was losing business for reasons completely unrelated to PGM. According to Weinpert, he should not be responsible for monies he made from customers that left American and chose to do business with PGM instead.
 {¶ 26} On the record before this court, there is undisputed evidence that while he worked at PGM he charged his customers $85 per hour instead of the $130 or $150[4] that American billed for his services. Tom Browning of Corsa, one of PGM's customers and Weinpert's own witness, admitted that one reason he left American was that Weinpert charged much less.
 {¶ 27} William Maruschak of Guild International stated that he had been doing business with American since 1997. At some point he became dissatisfied with American's work, and American sued his company for unpaid invoices. Maruschak acknowledged that some of the work he claims he was dissatisfied with was probably done by Weinpert. Nonetheless, when Weinpert left American, Maruschak continued to do business with him.
 {¶ 28} From this evidence, we reject Weinpert's claim that American lost business through no fault of his and that he should not be held accountable for that lost business. To the contrary, the evidence supports the conclusion proferred by American and reached by the trial court that clients left American to work with Weinpert because of his significantly reduced rate. Weinpert produced no evidence that the $135,842.17 he made at PGM was the result of anything but his own surreptitious actions.
 {¶ 29} Because American did not pay Weinpert his annual salary after he left the company, we conclude that the trial court did not err in calculating American's lost profits by subtracting the amount of Weinpert's annual salary of $90,000 from the $135,842.17 he netted in profits at PGM. Thus the court did not err in awarding plaintiff $45,842.19.[5] Weinpert's third assignment of error is overruled.
"IV. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY IGNORING EVIDENCE THAT AMERICAN BOTH EXPRESSLY AND IMPLIEDLY WAIVED NON-COMPETE AND NON-SOLICITATION PROVISIONS OF ITS' EMPLOYMENT AGREEMENT WITH WEINPERT BY REPEATEDLY REFERRING BUSINESS TO WEINPERT IN THE DAYS AND MONTHS SUBSEQUENT TO HIS DEPARTURE FROM AMERICAN."
 {¶ 30} Weinpert argues that when American referred work to him after he had left the company, it waived any claim here that he breached the Agreement.
 {¶ 31} "A waiver is the voluntary relinquishment of a known right."Custom Fountains v. Bryant, (July 18, 1994), Warren App. No. CA93-12-097, 1994 Ohio App. LEXIS 3166, at *4, citing The White Co. v.The Canton Transportation Co. (1936), 131 Ohio St. 190, 2 N.E.2d 501, paragraph one of the syllabus. In order to prove that a party has waived its rights, the party asserting waiver must prove "a clear, unequivocal, decisive act * * * showing such a purpose or acts amounting to an estoppel * * *." White at 198-199. Whether a party has waived a covenant not to compete is a question of fact. Custom Fountains, at *5.
 {¶ 32} In the case at bar, Weinpert points to the trial testimony of both Richard Totedo, Vice President of consulting at American, and Cary Root to demonstrate that American waived the Agreement with him when it affirmatively referred business to him after he had left the company. We reject Weinpert's argument on the issue of waiver, especially his characterization of the testimony presented by Totedo and Root at trial.
 {¶ 33} Totedo testified that he received a call from a woman who was looking for Weinpert after he left American. Weinpert had written a custom computer program for her before he began working for American in 1997. Totedo acknowledged that he told Weinpert about the woman, but he insisted that he never "referred" her to Weinpert to do business. Totedo stated that he did not think Weinpert would do business with her because of the Agreement. Contrary to Weinpert's interpretation of Totedo's testimony, the record, taken as a whole, demonstrates that Totedo never consented to Weinpert acting as a consultant or in any other capacity for American clients once he left the company. Tr. 312. Weinpert takes Root's testimony out of context as well. Weinpert claims that an e-mail Root sent him proves that American referred him business after he left the company and, therefore, the company intended to waive the Agreement with him. The record, however, belies Weinpert's argument.
 {¶ 34} Weinpert himself explained the purpose of Root's e-mail:
Q: I'd like to refer you to Exhibit E. Mr. Root knew you were doing work for this company in Texas?
A: Yes, he did.
Q: How do you know that he was aware of that?
A: Well, we talked about it. He — he approached me — he was having trouble collecting money from Woodline Products. He contacted me, and I don't know if it was by e-mail or by phone. He contacted me to — and asked me to go down with him to a meeting to put me in contact with Woodline to try to explain to them what the work was that was done, to be there to support Cary on the work that was done as a consultant for Woodline while I was still at American Logistics Group. And during that —
* * *
Q: Take a look at the third page. It's an e-mail from Mr. Root to you.
A: Yes.
Q: What's your e-mail address?
A: Joe@pgmacros.com.
Q: What does Mr. Root say in his e-mail to you?
A: Joe, I guess I shouldn't be surprised by this. Sorry for all the inconvenience. If you need to go to Texas this week, just do it. E-mail me the next time you'll be able to get together with them and I'll work it out with Jennifer.
Jennifer is the — I guess the controller or — she was always our main contact at Woodline when I was at American Logistics Group.
Tr. 408-410.
 {¶ 35} Weinpert's own explanation of Root's e-mail does not establish Root waived the Agreement. Asking Weinpert to handle a billing dispute for work he had done while he was still at American does not translate into a waiver. The company asked Weinpert simply to talk with Woodline about the subject invoice so that the company could be paid for past work. Root's e-mail says nothing about Weinpert doing further business with Woodline.
 {¶ 36} Even though Root admitted that he once entertained the idea of referring work to Weinpert after he had left the company, we find no evidence that he actually did so. And, even though Weinpert testified that Don Peters, one of American's employees, ultimately referred him to Midwest Engine, there is no evidence that Don Peters had the authority to make such a referral. In fact, the evidence is that American never knew about Midwest Engine because Peters made Weinpert promise not to tell Cary or anybody that Weinpert called him.
 {¶ 37} We do not find Totedo's call and Root's e-mail, therefore, intentional business referrals to Weinpert. Even Weinpert acknowledges that in both instances the communications from American involved two customers that he had personally worked with when he was at American. That Weinpert was asked to do troubleshooting for these customers does not amount to a waiver of Weinpert's non-compete. It is also not the same situation described in Surgidev Corp. v. Eye Technology, Inc., (1986),648 F. Supp. 661, cited by the dissent.
 {¶ 38} In Surgidev, the court held that the employer had waived the non-competition agreements because it had allowed some of the employees to work for competitors without objection. Surgidev is inapplicable to the facts in the case at bar because there is no evidence that Weinpert was ever "employed" by either customer. His role was no more than an epilogue to his prior work at American. Weinpert never produced any evidence that he made any money from doing work for either customer. The absence of such evidence underscores the unlikelihood that American intended to refer business to him after he had left the company. Without evidence that Weinpert formed a revenue-based business relationship with either customer, Weinpert's claim that American meant to refer business to him and thus waived the terms of his non-competition agreement fails for lack of support.
 {¶ 39} For the foregoing reasons, this court concludes that American did not waive Weinpert's Agreement. Accordingly, we overrule Weinpert's fourth assignment of error.
"V. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY FAILING TO FIND THAT THE NON-COMPETITION PROVISION CONTAINED IN THE EMPLOYMENT AGREEMENT BETWEEN THE PARTIES WAS OVERLY BROAD AND UNDULY RESTRICTIVE, AND THUS NOT ENFORCEABLE."
 {¶ 40} Weinpert argues that the trial court erred in determining that he breached the Agreement. According to him, one cannot breach a non-competition agreement that is unreasonable per se.
 {¶ 41} In Ohio, a plaintiff must satisfy a three-pronged test to determine whether a non-competition provision is reasonable:
"A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public."
Raimonde v. Van Vlerah (1975), 42 Ohio St.2d 21, 26, 325 N.E.2d 544. "[R]estrictions upon an employee will be enforced to the extent necessary to protect an employer's legitimate interests." Rogers v. Runfola Associates, Inc. (1991), 57 Ohio St.3d 5, 8, 565 N.E.2d 540, citingRaimonde; see, Basicomputer Corp. v. Scott, (N.D. Ohio 1991),791 F. Supp. 1280, 1289.
 {¶ 42} In deciding whether a non-competition agreement is reasonable, the following factors should be considered:
"the absence or presence of limitations as to time and space, * * * whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment."
Rogers, supra., at 8, citing Extine v. Williamson Midwest (1964),176 Ohio St. 403, 406, 200 N.E.2d 297.
 {¶ 43} In the case at bar, Weinpert argues that the 75 mile[6]
restriction of his Agreement is not a reasonable restrictions because it imposes an undue hardship upon his ability to make a living. We disagree.
 {¶ 44} Root testified that Weinpert had first worked for American in the late 80's. Weinpert was terminated, however, when Root discovered he was doing work for a non-client of American. Root rehired Weinpert in 1997 and attempted to protect the company by requiring Weinpert to execute the Agreement.
 {¶ 45} Root stated that it has taken years for him to build American's client base and that most of his business and reputation is based on word-of-mouth referrals. There is also evidence that many of the company's clients require and depend upon close contact with American's consultants. This close contact increases the opportunity for an employee to leave the company and take American clients.
 {¶ 46} We conclude that American's non-compete agreement is necessary to protect its legitimate business interests. Employers such as American rely heavily upon an active service team and close client contact. Moreover, the computer service/products industry is perhaps one of the most competitive industries today. Accordingly, such companies have a legitimate interest in protecting their reputation and client base from former employees.
 {¶ 47} Defendant also has challenged the agreement's prohibition that Weinpert not "directly or indirectly, alone or in association with others, own, operate, engage in or be in any way employed by or connected or affiliated with, or render advice or services to, any business which is competitive with the business of ALG and which is located within a radius of seventy-five (75) air miles from any office of ALG." Employment Agreement, Plaintiff's Exhibit 1.
 {¶ 48} Weinpert claims this provision imposes an undue hardship on him. Weinpert did not produce any evidence, however, about the unreasonableness of the Agreement. Nor is there any evidence that Weinpert could not obtain non-competitive work within the 75-mile geographical limitation.
 {¶ 49} Weinpert testified that his computer skills include being able to create macro programs along with developing "add-on functions that anybody that owned Macro Express could buy and it would enhance their program." Tr. 410. Weinpert further admitted that he has authored a book entitled "Macro Express Explained." This book takes his reputation beyond the 75-mile prohibition. Moreover, he has over 24 years experience with computers. There is no evidence that Weinpert's considerable expertise and products have value solely within the 75-mile restricted area.
 {¶ 50} Weinpert has not demonstrated that he is unable to obtain employment with a company that could use his computer skills. We acknowledge Weinpert's claim that he prefers to be self-employed. It is his burden, however, to show he could not secure employment with a company that does not compete with American. This type of employment remains open to Weinpert and there is no evidence to demonstrate that he ever availed himself of this possibility. That Weinpert prefers the autonomy of self-employment does not mean that American's 75-mile non-compete restriction is unreasonable. Moreover, Weinpert has not argued that his talents are saleable only on a local level.
 {¶ 51} We conclude it is reasonable for American to impose a 75-mile geographic restriction in light of the competitive nature of the computer industry, American's large client base,[7] and its experience with Weinpert in the late 1980's. American's 75-mile non-competition provision is a reasonable means of protecting its own business interests. Accordingly, Weinpert's fifth assignment of error is overruled.
B. American's Cross Assignments of Error
"I. THE TRIAL COURT ERRED IN ITS CALCULATION OF AMERICAN'S DAMAGES BY UTILIZING WEINPERT'S SELF-SERVING, SELF EMPLOYED HOURLY RATE AFTER LEAVING THE EMPLOY OF APPELLEE INSTEAD OF WEINPERT'S MARKET HOURLY RATE WHILE EMPLOYED WITH AMERICAN."
 {¶ 52} American argues that the trial court should have awarded its damages based on Weinpert's $150 per hour rate instead of using the $85 per hour rate he charged clients.
 {¶ 53} As stated earlier, proof of lost profits must be reasonably certain and may not be speculative. On Line Logistics, Inc., supra., at ¶ 58. In the case at bar, American says that its total damage award should have been $239,722.43 ($150 per hour) instead of the $135,842.18 ($85 per hour). When the trial court rendered its verdict it determined in part that
"the value of Defendant's services is $85.00/hour, there being no evidence that ALG could have billed him out for $150.00 per hour under these circumstances."
 {¶ 54} Verdict at 3. We agree with the trial court. American did not present any of its former clients as witnesses. Nor is there any evidence that any of the clients with whom Weinpert was doing business at the $85 per hour rate would have stayed with American and paid $150 per hour for those same services. On the contrary, Browning even admitted that he left American in part because at PGM Weinpert charged much less per hour. Of the two clients who testified for Weinpert, neither stated that he would have returned to American and been willing to pay the $150 rate. American's argument that its damages should have been calculated at Weinpert's $150 rate is, therefore, merely speculative. Accordingly, American's first cross-assignment of error is overruled.
"II. THE TRIAL COURT ERRED BY FAILING TO AWARD PUNITIVE DAMAGES TO AMERICAN FOR WEINPERT'S MALICIOUS AND EGREGIOUS BREACH OF THE NON-COMPETE/NON-SOLICITATION AGREEMENT."
 {¶ 55} American argues that it should have been granted punitive damages. We disagree.
 {¶ 56} In Ohio "punitive damages are not recoverable in any action for breach of contract even though it is alleged that the breach was unlawful, wilful, wanton and malicious." RH Trucking v. Occidental Fire Cas. Co. (1981), 2 Ohio App.3d 269, 271. However, under the Ohio rule,
"punitive damages are recoverable for a tort committed in connection with, but independently of, a breach of contract, the allowance of the punitive damages being for the tort, and not for the breach of the contract. However, the breach must be attended by some intentional wrong or gross negligence which amounts to an independent tort, and must be accompanied by the attendant aggravating circumstances of wanton, reckless, malicious, or oppressive conduct that ordinarily gives rise to punitive damages."
Id., at 272.
 {¶ 57} In the case at bar, American claims that it is entitled to an award of punitive damages because Weinpert underbid its hourly rate, he took away clients he met while employed at American, and he improperly used trade secrets. American does not, however, allege that Weinpert ever committed a specific and independent tort against the company.
 {¶ 58} The record amply demonstrates that Weinpert violated his non-competition agreement after he left American in March 2001. We do not find that Weinpert's post-employment conduct, however, constitutes an independent tort committed against American in a wanton, reckless, malicious, or oppressive manner.
 {¶ 59} Accordingly, the trial court did not err in determining that American was not entitled to an award of punitive damages. Accordingly, American's second cross-assignment of error is overruled.
Judgment accordingly.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
McMonagle, J., Concurs.
 Corrigan, J., dissents with separate dissenting opinion.
[1] The case was tried to the bench.
[2] Plaintiff's Exhibit 7 lists the clients Weinpert dealt with between 1997 and 2001: Eastgate Cleaners, Fanny's Inc., Guild International, JR Tickets, Midwest Engine Sales, Perfection Valet Cleaners, Western Reserve Wire Products, Woodline, Telecom 2000 Network, Acme Spirally Bound, and Corsa.
[3] Since the record shows that the parties agreed on $31,206 as the stipulated amount, we presume that the transcribed figure $31,260 is an error.
[4] When he left American, the company was billing his services at $150.00 per hour, an increase from his previous $130 rate.
[5] The actual amount should be .02 cents less. Since this is a de minimus error, however, we do not alter the award as given by the trial court.
[6] Weinpert also claims the non-compete agreement's twelve-month restriction is unreasonable. Beyond this initial and conclusory statement about the time restriction, however, Weinpert does not present any other argument about the time restriction. Therefore, we do not substantively address the restriction either except to say that a one-year time limitation has been repeatedly held to be reasonable. See, e.g.,Raimonde, supra. ; Rogers, supra.
[7] Approximately 6,400 clients.
 DISSENTING OPINION