DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the judgment of the Lucas County Court of Common Pleas which granted the motion for summary judgment filed by appellees, David L. Swartz, Premium Transportation Logistics LLC ("PTL"), Chris *Page 2 
Morey, and John Mueller (collectively referred to as "appellees"), and denied the motion for summary judgment filed by appellant, Try Hours, Inc. ("Try Hours"). For the reasons that follow, we reverse the decision of the trial court.
 {¶ 2} On appeal, Try Hours raises the following assignments of error:
 {¶ 3} "I. The trial court erred in granting defendant-appellees' cross-motion for summary judgment on the basis that plaintiffs expert, Blake Radcliffe, failed to calculate the lost profit damages to a reasonable degree of certainty using an approved methodology.
 {¶ 4} "II. The trial court erred in holding that plaintiff-appellant was not entitled to seek any damages for those customers identified in the stipulated permanent injunction order.
 {¶ 5} "III. The trial court erred in granting defendant-appellees' cross-motion for summary judgment, and dismissing plaintiffs claim for punitive damages.
 {¶ 6} "IV. The trial court erred in dismissing all of plaintiffs claims."
 {¶ 7} Try Hours is a locally owned trucking operation that provides expedited freight services for its customers. Mueller, Morey and Swartz each held a top management position with Try Hours, and each signed an agreement that they would not engage in unfair competition with Try Hours, solicit Try Hours' customers or employees, and would keep confidential Try Hours' business information, for a period of one year following termination of their employment with Try Hours, and would not solicit Try Hours' drivers for a period of two years. Mueller (former safety director) resigned from *Page 3 
Try Hours in October 2001, Morey (former operations manager) resigned in March 2003, and Swartz (former sales manager) resigned in September 2003. Mueller, Morey and Swartz formed PTL prior to Swartz's and Morey's resignations from Try Hours. Mueller began full-time at PTL January 1, 2003, Morey in April 2003, and Swartz in September 2003.
 {¶ 8} Since its inception, PTL served some of the same customers that Try Hours served and used some of the same truck drivers that Try Hours had used. As a result, on October 29, 2003, Try Hours filed a verified complaint and motion for temporary restraining order, alleging: (1) breach of contract; (2) breach of common law fiduciary duties; (3) conversion; (4) misappropriation of trade secrets; (5) unfair competition; (6) tortious interference with business relations; (7) violations of the Ohio Uniform Trade Secret Act; and (8) punitive damages. The motion for temporary restraining order was granted ex parte. On February 18, 2004, the parties entered into a stipulated permanent injunction, whereby the parties agreed that PTL would be enjoined from contacting, soliciting, or hauling freight on behalf of 71 customers designated by Try Hours for an additional period of one year, beginning February 1, 2004. PTL was also enjoined from contacting, soliciting, contracting, or hiring any drivers who had worked for Try Hours for a period of two years, beginning February 1, 2004. The stipulation specified that "[i]t shall not affect any claims for monetary relief * * * as may be asserted by Plaintiff or any defenses of the Defendants." *Page 4 
 {¶ 9} Try Hours filed a motion for summary judgment with regard to damages on October 6, 2004. In support of its motion, Try Hours filed the affidavit of David Hiatt, CPA, who determined that using a "before and after" methodology for business valuation, appellants incurred damages totaling $1,250,000 for 2002 and 2003. On August 1, 2005, appellees responded to appellant's motion for summary judgment and filed a cross-motion for summary judgment, asserting that, based on Hiatt's affidavit, appellant did not demonstrate the existence and amount of future lost profits with reasonable certainty, that the method for calculating Try Hours' alleged consequential damages was flawed, and that punitive damages cannot be awarded pursuant to a motion for summary judgment.
 {¶ 10} In support of its response and cross-motion for summary judgment, appellees included the affidavit of Jeffrey S. Denning, CPA, who identified errors with Hiatt's valuation methods, including, a lack of: (1) research regarding standard industry and comparable company performance; (2) customer analysis; (3) deductions for variable cost components necessary to calculate lost net profits; (4) analysis for the appropriate damages period; (5) consideration of mitigating actions and factors; (6) reasonableness tests; and (7) consideration of PTL's sales for 2003. Particularly, Denning noted that establishing the existence and amount of lost profits in this type of action "requires performance of standard industry and comparable company research and analysis under the commonly utilized `yardstick approach,'" which Hiatt did not use. Denning also stated, "Hiatt failed to consider that [PTL] had sales of $462,000 (not $4.3 million) and a loss in 2003." *Page 5 
 {¶ 11} In addition to his affidavit, Denning testified in a deposition wherein he described the three methods that could be used for valuing lost profits: (1) the sales projection method (but/for method), whereby sales are projected to determine anticipated net profits; (2) the before and after method, whereby the periods immediately before and after the alleged breach occurred are examined to determine the lost profits during the damage period; and (3) the yardstick method, which examines the performance of a comparable company to determine, through comparison, the amount the claimant could have expected to earn during the same time period. Denning testified that had he done a valuation of lost profits, he would have considered all three methods, and that any of the methods could be appropriate. He further testified that he would look at the historical sales and profits within an industry, when available, to determine gross and net profits and to do forecasts. In particular, Denning testified that he would "certainly consider" sales data of Try Hours' customers before and after the breach, including the amount of sales that was provided to those customers by PTL. By using such information, Denning opined that the before and after method or the yardstick method would be the most appropriate to use. Denning stated that the "yardstick might be useful as opposed to just using the subject company data in a vacuum," to provide a basis for reasonableness. However, he noted that the sales projection method may be appropriate as well, but said, "if you have sufficient data to use the other two methods you may be able to take some of the guesswork out of using a sales projection model." Finally, regarding valuation, Denning testified that during a given period of time, he "would assume that a certain *Page 6 
level of the business would be sustained," that certain customers may turn over, but that the business would "not make any drastic changes."
 {¶ 12} On October 12, 2005, the trial court granted Try Hours' motion to compel production of financial documents from PTL. Thereafter, on November 3, 2005, Try Hours filed an affidavit of Blake N. Radcliffe, CPA. Radcliffe, who had been retained as an expert to analyze and calculate any business damages sustained by Try Hours, stated that in his professional opinion: (1) "there are several well-accepted methods which may be utilized to calculate damages to a business, including the before and after method, the yardstick method, and the but for/sales method"; (2) "regardless of the preferred methodology applied, it is reasonable to take the profits received by the Defendants from Try Hours' customers during the relevant time periods, and use that as a basis for calculating the damages sustained by Try Hours"; and (3) "Try Hours sustained significant and substantial losses to its business." In describing the method he used to calculate Try Hours' damages of $64,000 to $85,000 for 2003, and $180,000 for 2004, Radcliffe stated:
 {¶ 13} "In reaching my professional opinion, I identified all gross revenue received by Defendant PTL from customers who were or had been customers of Try Hours, and subject to the employment contracts each individual defendant executed. I then calculated a net margin for Defendant PTL based on the partial data provided and also calculated a net margin for Plaintiff Try Hours based on its financials, calculating the driver profit percentage and other cost of sales percentage." *Page 7 
 {¶ 14} Radcliffe further explained his findings in a supplemental affidavit, filed November 22, 2005, wherein he stated:
 {¶ 15} "* * * `monetary loss' [as used in the November 3, 2005 affidavit] is defined as the monetary value of the pre-tax net income, not sales or gross profits, sustained by Plaintiff due to the loss of the diverted sales. The calculation of pre-tax net income takes into account both direct and indirect costs, including but not limited to fixed costs such as overhead, depreciation and interest, and variable expenses, including but not limited to variable operating expenses and direct cost of sales (i.e. driver payments)."
 {¶ 16} In addition to his affidavits, Radcliffe testified in a deposition that he determined Try Hours' net loss of profits by calculating PTL's gross revenue based on sales made to former Try Hours customers, and then reducing that amount by the costs Try Hours would have incurred in generating that amount of revenue. In making his valuation, Radcliffe testified that he used the "but for/sales method" because he felt that "the only appropriate method was to look at the actual sales that PTL had and take those sales and apply the cost structure of Try Hours as if they had those additional sales in the years in question and determine the calculation of the lost net profits * * *." Radcliffe testified that he used this method, rather than the "yardstick" method because there were no available industry statistics to compare, due to Try Hours being in a "specialty niche," and, in any event, the more acceptable and appropriate data to rely upon was "the actual sales numbers as reported by PTL on their financial statements and customer revenue report and the actual cost structure of Try Hours." *Page 8 
 {¶ 17} In calculating the amount of costs Try Hours would have incurred in generating the additional revenue, Radcliffe testified that he examined Try Hours' financial statements from 1998-2004 to determine a trend, and included as costs the percentages received by drivers, other direct costs, and incremental nondirect expenses, such as overhead, depreciation and interest.[1] Radcliffe, however, noted that the additional volume of sales would not have incrementally increased Try Hours' nondirect and overhead expenses because Try Hours "would have been able to absorb those additional sales" within its current structure. Additionally, in determining what amount of PTL's gross revenue Try Hours would have likely received from its previous customers, whose sales were "taken" by PTL, Radcliffe testified that he used a general business rule of thumb of "approximately 20 percent turnover and 80 percent retainage."
 {¶ 18} Ultimately, Radcliffe calculated, in his professional opinion and to a reasonable degree of certainty, that Try Hours sustained loss of pre-tax net income, as a result of PTL's unfair competition, totaling approximately $416,370 for the calendar years of 2003 and 2004, and $281,545 future lost profits for 2005. These amounts indicate the "additional net lost profits that Try Hours would have had but for the fact that those sales were taken by PTL." Radcliffe determined that the percentage of profit margin, for PTL sales to Try Hours' customers, was 19 percent in 2003 and 22.9 percent *Page 9 
in 2004. Radcliffe recognized, however, that Try Hours' reported net income as a percentage of total sales was a negative .5 percent in 2003 and .5 percent in 2004.[2]
 {¶ 19} In its February 1, 2006 judgment entry, the trial court granted PTL's motion for summary judgment and dismissed Try Hours' complaint. The trial court held that "the only issues that remain to be determined are the extent of Try Hours' injuries and damages," but found that Try Hours failed to prove its damages for lost profits because "lost profits must be measured by the loss of business sustained by the plaintiff, not by the gain of or effect on the defendant's business." The trial court also found that "there is no record support for Try Hours' assumption that the customers that Radcliffe included in his calculation would remain with or generate additional revenues for Try Hours," and that "Try Hours cannot claim damages based upon customers that it relinquished in the Stipulated Permanent Injunction." Having held that Try Hours failed to establish compensable damages, the trial court also dismissed Try Hours' claim for punitive damages.
 {¶ 20} In reviewing a motion for summary judgment, an appellate court must apply the same standard of law as the trial court. Lorain Natl.Bank v. Saratoga Apts. (1989), 61 Ohio App.3d 127, 129. As such, summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). This review is *Page 10 
done by an appellate court de novo, Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105, and requires the court to independently examine the evidence to determine, without deference to the trial court's determination, if summary judgment is warranted. Brewer v. ClevelandCity Schools (1997), 122 Ohio App.3d 378, 383, citing Brown v. CountyComm'rs (1993), 87 Ohio App.3d 704, 711.
 {¶ 21} In this case, Try Hours' claims for relief included breach of contract, breach of fiduciary duties, conversion, misappropriation of trade secrets, unfair competition, tortious interference with business relations, and violations of the Ohio Uniform Trade Secret Act. In granting summary judgment to appellees, the trial court held that Radcliffe, Try Hours' expert, was not permitted to rely on PTL's financial data and sales revenue when calculating Try Hours' lost net profits. In its first assignment of error, Try Hours argues that the trial court erred in granting PTL's cross-motion for summary judgment on the basis that Try Hours' expert failed to calculate the lost profit damages to a reasonable degree of certainty using an approved methodology. Specifically, Try Hours argues that the trial court's reliance on Developers Three v. Nationwide Ins. Co. (1990),64 Ohio App.3d 794, and Lewis v. Surgery Gynecology, Inc. (Mar. 12, 1991), 10th Dist. No. 90AP-300, was misplaced.
 {¶ 22} "In order for a plaintiff to recover lost profits in a breach of contract action, the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." Gahanna v.Eastgate Properties, Inc. (1988), 36 Ohio St.3d 65, syllabus. See, also,Charles R. Combs Trucking Inc. v. International Harvester Co. *Page 11 
(1984), 12 Ohio St.3d 241, paragraph two of the syllabus. Further, "Ohio law `requires that evidence of lost profits be based upon an analysis of lost "net" profits after the deduction of all expenses impacting on the profitability of the business in question.'" (Emphasis in original.)Miller Medical Sales, Inc. v. Worstell (Dec. 21, 1993), 10th Dist. No. 93-AP-23, citing Justice Wright's concurrence, in part, and dissent, in part, in Digital Analog Design Corp. v. North Supply Co. (1989),44 Ohio St.3d 36, 48. Unless a party proves "(a) what he would have received from the performance so prevented" and "(b) what such performance would have cost him (or the value to him of relief therefrom)," he cannot recover as damages the profits he would have earned from full performance of the contract. Digital at 40, citingAllen, Heaton McDonald, Inc. v. Castle Farm Amusement Co. (1949),151 Ohio St. 522, 526. "Evidence which does not meet these thresholds must be considered speculative and an insufficient basis for an award of damages." Digital at 40.
 {¶ 23} Additionally, in actions for misappropriation of trade secrets and cases involving breaches of fiduciary or confidential relationships, which Try Hours also claims, "the proper measures of damages for misappropriation of trade secrets * * * are either the award to plaintiff of profits lost by the misappropriation or an accounting by defendant of profits gained by the misappropriation." Wiebold Studio,Inc. v. Old World Restorations, Inc. (1985), 19 Ohio App.3d 246, 251. This measure of damages for misappropriation of trade secrets was codified in R.C. 1333.63(A), effective July 20, 1994, which stated that "[d]amages may include both the actual loss caused by *Page 12 
misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." In MillerMedical Sales, Inc. v. Worstell (Dec. 21, 1993), 10th Dist. No. 93-AP-23, the court held that "plaintiff would be entitled to the higher amount of either plaintiffs lost profits or defendant's gain." The Tenth District noted, however, that the award cannot be based upon a gross revenue amount; rather, the total gross billings must be reduced by "any costs and expenses defendant would have incurred in producing income on the accounts and which should have been deducted from the gross revenue figure to determine defendant's net gain." Id.
 {¶ 24} In a case involving the tortious interference with a business contract, the Tenth District Court of Appeals held that "plaintiffs correct measure of damages in this tortious interference action is the plaintiffs loss (including lost profits) that arises out of the tortious interference, not the defendant's gain." Developers Three,64 Ohio App.3d 794, 803. In Developers Three, defendants bought and developed property to which plaintiff had held an option to purchase. Plaintiff sued upon a theory of tortious interference with a business contract and claimed that, irrespective of the amount of its actual loss, it was entitled to recover, under a theory of unjust enrichment, the amount of defendants' profits that were derived from the development. In fact, plaintiff "explicitly disclaimed] a measure of damages based upon its lost profits or lost expectancy," and, instead, sought to recover defendants' entire gross profits. Id. at 797. Defendants, however, argued that plaintiff did not have the same ability as defendants to develop the property and, therefore, plaintiffs recovery of defendants' profits would not be *Page 13 
appropriate because plaintiffs actual loss was much less than defendants' gain. Id. at 797-798.
 {¶ 25} Unjust enrichment occurs when a person "has and retains money and benefits which in justice and equity belong to another." Hummel v.Hummel (1938), 133 Ohio St. 520, 528. In Developers Three, the court considered at length the pros and cons of allowing an award of damages based upon a theory of unjust enrichment. Ultimately, the court held that it was "reluctant to abandon a purely compensatory damage formula unless policy and precedent clearly support an unjust enrichment theory of recovery." Developers Three at 801. In determining that damages awarded upon a theory of unjust enrichment was not the best method for calculating plaintiffs damages, the court noted that in tortious interference cases "the plaintiff frequently has lost more than the defendant has gained, and sometimes the defendant has gained more than the plaintiff has lost." Id., citing Restatement of the Law, Restitution (1937) 595-596, Introductory Note to Section 150, et seq. Additionally, the court noted that "`[t]o compel defendant to disgorge [its] profits could give plaintiff a windfall and penalize the defendant. * * *'" Id. at 800, citing American Air Filter Co. v. McNichol (C.A.3, 1975), 527 F.2d 1297, 1300. Although the usual justification for awarding a defendant's unjust enrichment to the plaintiff is to discourage commission of the tort, Developers Three held that "punitive damages may serve well to counterbalance the unavailability of an unjust enrichment theory in tortious interference cases." Developers Three at 801. *Page 14 
 {¶ 26} Since Developers Three, this court and the Tenth District have both cited to Developers Three for the rationale that "[l]ost profit damages are measured by the loss, including lost profits the plaintiff business sustained as a result of the tortious interference, not by its effect upon the defendant's business." UZ Engineered Products Co. v.Midwest Motor Supply Co., Inc. (2001), 147 Ohio App.3d 382, ¶ 55 (damages for breach of non-competition agreement at issue); andBrookeside Ambulance, Inc. v. Walker Ambulance Serv. (1996),112 Ohio App.3d 150, 158 (tortious interference case). In applying this holding from Developers Three to the present case, the trial court held that, when calculating Try Hours' lost profits, Radcliffe was not permitted to consider the amount of revenue PTL generated from sales to Try Hours' customers. Because Radcliffe used the amount of PTL's profits in calculating Try Hours' net lost profits, the trial court held that Radcliffe's method of computation was speculative and did not substantiate Try Hours' damages. We, however, find that DevelopersThree is not applicable because it is distinguishable from the facts in this case.
 {¶ 27} When read in context of its entire decision, the holding inDevelopers Three is clearly limited to situations wherein the plaintiff seeks recovery on the basis of unjust enrichment. As stated above, Developers Three, the plaintiff, explicitly was not seeking a recovery on the basis of lost profits. Hence, the Tenth District was charged with determining whether the plaintiff could disgorge defendant of its profits pursuant to a theory of unjust enrichment, rather than upon a "lost profits" basis. Ultimately, the court rejected the plaintiffs theory of recovery on the basis of unjust enrichment, "plaintiffs *Page 15 
correct measure of damages in this tortious interference action is the plaintiffs loss (including lost profits) that arises out of the tortious interference, not the defendant's gain [emphasis added]," and affirmed a compensatory damages method of recovery. Developers Three, supra at 803. Additionally, although both UZ Engineered Products and BrookesideAmbulance correctly cited the holding in Developers Three, neither case involved a claim for unjust enrichment and the amount of the defendants' profits were not at issue. Rather, in each case, the courts recognized that the appropriate measure of damages for lost profits was a compensatory damage formula, whereby lost profits are calculated by reducing the amount of revenue plaintiff would have generated, but for the tortfeasor's actions, by the costs the plaintiff would have incurred in generating such revenue. See, also, Digital Analog Design, supra at 40.
 {¶ 28} We find that Radcliffe's calculation of net lost profits was not speculative and was demonstrated with reasonable certainty. Radcliffe, an expert accredited in business valuations by the American Institute of Certified Public Accountants, testified that, regardless of the method, before and after, yardstick, or but for/sales method, used to calculate damages to a business, it is reasonable to take PTL's profits from Try Hours' customers, during the relevant time periods, and use those amounts as a basis for calculating the damages sustained by Try Hours. He stated that the more acceptable and appropriate data to rely upon was "the actual sales numbers as reported by PTL on their financial statements and customer revenue report and the actual cost structure of Try Hours." Appellees' expert, Jeffrey Denning, also testified that he would "certainly consider" *Page 16 
sales data of Try Hours' customers before and after the breach, including the amount of sales that was provided to those customers by PTL, in determining Try Hours' damages.[3] In fact, Denning criticized Try Hours' initial expert, Hiatt, for failing to consider the amount of PTL's sales when calculating Try Hours' lost profits.
 {¶ 29} Moreover, we find that there is support in Ohio for using an accounting of the tortfeasor's profits, gained through misappropriation of trade secrets, breaches of fiduciary or confidential relationships, and breaches of non-competition agreements, in calculating a business's damages and lost profits. See, e.g., Wiebold Studio, Inc. v. Old WorldRestorations, Inc. (1985), 19 Ohio App.3d 246, 251 (a proper measure of damages for misappropriation of trade secrets is an accounting by defendant of profits gained by the misappropriation); R.C. 1333.63(A) (damages may include the unjust enrichment caused by misappropriation);Miller Medical Sales, Inc. v. Worstell (Dec. 21, 1993), 10th Dist. No. 93-AP-23 (plaintiff was awarded damages in an amount equal to gross profits received by defendant while breaching a non-competition agreement); American Logistics Group, Inc. v. Weinpert, 8th Dist. No. 85041, 2005-Ohio-4809, ¶ 29 (trial court did not err in calculating lost profits by subtracting the tortfeasor's salary, which would have been the company's cost in generating the extra revenue, from the amount defendant netted in profits while breaching the non-competition agreement); and Cleveland Cotton Products v. James (Oct. 31, 1996), 8th Dist. No. 70051 (lost profits calculated by *Page 17 
subtracting plaintiffs normal costs from defendant's gross sales generated while breaching the non-competition agreement).
 {¶ 30} We additionally find that the trial court erred in awarding appellees summary judgment on the basis that Try Hours' asserted damages were speculative and not based upon reasonable certainty because "there is no record support for Try Hours' assumption that the customers that Radcliffe included in his calculation would remain with or generate additional revenues for Try Hours." In making this determination, the trial court relied on Lewis v. Surgery Gynecology, Inc. (Mar. 12, 1991), 10th Dist. No. 90AP-300, wherein the court found the company's damages to be unbelievable, in part, because the medical group's calculation of damages assumed that all of its former patients, who were treated by Lewis after his departure, would have come back to the medical group had Lewis not been practicing within Franklin County. Try Hours does not make the same assumption regarding the retention of customers that the medical group in Lewis made; rather, Radcliffe testified that he used a general business rule of thumb of "approximately 20 percent turnover and 80 percent retainage." Thus, unlike the medical group, Try Hours did not assume that it would have retained its entire customer base. Moreover, we find that Radcliffe's assumption was reasonable because appellees' expert also testified that he "would assume that a certain level of the business would be sustained," that certain customers may turn over, but that the business would "not make any drastic changes." We find that Lewis is distinguishable on its facts from this case and, therefore, find that the trial court's reliance on Lewis was misplaced. *Page 18 
 {¶ 31} Based upon Radcliffe's testimony, we find that Try Hours established the amount of its damages with reasonable certainty. We recognize that appellees raised issues to call Radcliffe's calculations into question, such as the fact that Try Hours did not have as large a profit margin prior to the damages period as he had calculated during the damages period, that Radcliffe did not determine the actual profitability of each of Try Hours' customers prior to the damages period, and the fact that Radcliffe opined that the additional revenue would not have increased Try Hours' fixed costs. Nevertheless, we find that these are issues which should be resolved by the trier of fact. Accordingly, we find that there are genuine issues of material fact which preclude the granting of summary judgment in this case and that appellees were not entitled to summary judgment as a matter of law. Try Hours' first assignment of error is therefore found well-taken.
 {¶ 32} Try Hours argues in its second assignment of error that the trial court erred in holding that Try Hours was not entitled to seek any damages for those customers identified in the stipulated permanent injunction order. We agree. The stipulation is silent as to any waiver by Try Hours to pursue damages, past or future, from appellees based upon their solicitation of Try Hours' customers. In fact, the stipulation clearly states that "[i]t shall not affect any claims for monetary relief * * * as may be asserted by Plaintiff or any defenses of the Defendants." Accordingly, we find that the trial court erroneously limited Try Hours' recovery in this respect. Try Hours' second assignment of error is therefore found well-taken. *Page 19 
 {¶ 33} In its third assignment of error, Try Hours argues that the trial court erred in granting appellees' cross-motion for summary judgment, and dismissing plaintiffs claim for punitive damages. We agree. The trial court's granting of summary judgment regarding Try Hours' claim for punitive damages was based solely upon the fact that it found that Try Hours had failed to establish compensatory damages with reasonable certainty. Having reversed the trial court's grant of summary judgment with respect to the issue of compensatory damages, we find that the trial court's award of summary judgment regarding punitive damages was also contrary to law. Appellant's third assignment of error is therefore found well-taken.
 {¶ 34} Try Hours argues in its fourth assignment of error that the trial court erred in dismissing all of its claims. Based upon our decision as to Try Hours' first, second and third assignments of error, we find Try Hours' fourth assignment of error well-taken.
 {¶ 35} On consideration whereof, the court finds substantial justice has not been done the party complaining and the judgment of the Lucas County Court of Common Pleas is reversed. This matter is remanded to the trial court for further proceedings in accordance with this decision and judgment entry. Appellees are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT REVERSED. *Page 20 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Handwork, J., Pietrykowski, P.J., and Glasser, J. concur.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] Radcliffe testified that he attempted to do a cost analysis for PTL, but found that PTL's profit reports were insufficient for him to make those calculations.
[2] Try Hours argues that its net income would have been greater in 2003 and 2004 if appellees had not taken Try Hours' customers.
[3] Denning, however, was not asked to calculate, or render an opinion regarding, the amount of Try Hours' damages. *Page 1